# Richmond

ELLIOTT W. SPICER v. MAE J. SPICER, ET AL.

March 12, 1951.

Record No. 3743.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*S. Page Higginbotham* and *H. C. DeJarnette,* for the appellant.

*Hiden, Bickers & Button* and *Joseph H. Stratton,* for the appellees.

HUDGINS, C. J., delivered the opinion of the court.

Elliott W. Spicer, by this writ of error, seeks to reverse a

judgment rendered against him in an action of ejectment instituted by him against Mae J. Spicer and others.

At the threshold we are confronted with a motion to dismiss on the ground that the certificates of exception were not signed within sixty days from the date of the judgment, as required by Section 8-338 of the Code.

It appears from the record and briefs that the case was called for trial on May 31, 1949. A jury was sworn and returned its verdict for defendants on June 1st, 1949. Attorneys for plaintiff moved to set aside the verdict on various grounds and asked for a continuance in order that they might have time to prepare briefs. On August 3, 1949, the motion was argued and written briefs filed with the judge. On November 28, 1949, the trial court filed with the papers a written opinion stating its reasons why the verdict should be sustained, and concluding ''The motion to set aside the jury's verdict is accordingly overruled.''

It is stated in the brief that ''Within two or three days following the reading and filing of the opinion,'' the attorneys for the respective parties ''reached agreement upon a final draft of order for the various dates for which no order had been entered and embodying the decision implicit in the aforementioned opinion, * * * ''

This ''final draft of order'' was a statement of all the proceedings in the case, including the swearing of the jury, the return of the verdict, various motions made, the ruling of the court on November 28th, the judgment on the verdict, the exceptions of counsel to the ruling of the court, and suspension of execution on the judgment for ''three months from this date'' to give plaintiff time in which to file his petition to this Court for a writ of error. The draft of this order was not presented to the judge until the 20th day of December, 1949, when it was signed by him.

Defendants contend that the sixty-day period within which the statute requires certification of exceptions by the trial judge began to run on November 28, 1949, the day the judge pronounced his decision, and not from December 20, 1949, the day on which the judge signed the draft of the order presented by counsel.

In support of this contention defendants rely upon *Daley* v. *Commonwealth,* 132 Va. 621, 111 S. E. 111. The facts in that case were that on the 26th day of February, 1921, the trial

judge, in open court, overruled defendant's motion to set aside the verdict, and pronounced judgment on the verdict, noted defendant's exceptions, and, on defendant's motion, suspended execution of the sentence, took his recognizance and bond, entered into in pursuance of the suspension of the execution of the sentence, a memorandum of all of which was made by the clerk in his minute book regularly kept by him in which to record the daily proceedings of the court, but no judgment or order was spread upon the order book until some time later. On April 27, 1921, bills of exception were presented to the judge, who refused to sign them on the ground that defendant had not presented them within sixty days from February 26, 1921, the date final judgment was pronounced. After this court had refused a writ of mandamus the case was presented on the record in which the unsigned bills of exception had been inserted. In an opinion affirming the judgment of the trial court, it was said: ''The universal practice is that the clerk extends the orders upon the permanent record of the court just as soon as possible, and they are thereafter read in open court and signed as orders of the date when the judgments were pronounced. This practice is recognized by Code 1919, section 5962, * * * '' (Sec. 17-27 of the 1950 Code).

In the *Daley Case* the court not only pronounced judgment on the verdict, it sentenced the defendant, suspended the sentence in order to give him time to prepare his petition for a writ of error, and admitted him to bail. In other words, the trial court did everything necessary to be done in order to make the judgment final. Nothing was left to be done except the ministerial act of the clerk of spreading the different orders of the court upon the order book. It was contemplated that the clerk should write the orders and, in due course, make a permanent record of them.

In the case now under consideration it does not appear that the clerk made a memorandum of the proceedings or that he was expected to write the orders for entry upon the permanent records. In the order signed by the judge on December 20, 1949, it is stated: ''On the 28th day of November, 1949, the Court, having advised counsel for both plaintiff and defendants it was then ready to render a decision in the matter, proceeded to hold that the verdict of the jury should be sustained (and filed a written opinion of its reasons therefor with the Clerk

of the Circuit Court of Orange County, which opinion is specifically made a part of the record in this case.)''

This is not a judgment. It is notice to counsel of the decision of the judge so that they might prepare the proper order making the decision effective.

It appears that some time after November 28th, 1949, the attorneys for the respective parties agreed upon the final draft of the order, which included all proceedings in the case from the date of the trial to the date the judgment was entered. It is stated in this order that ''No orders having been heretofore entered on the days referred to in this order, this one order is entered now to have the same force and effect as if entered on the respective days.''

A *nunc pro tunc* order may be entered where the former judgment has been pronounced by the court, but not entered of record by reason of some accident or mistake, or through the neglect or omission or misprision of the clerk, provided that there be satisfactory evidence, not only of the rendition, but of the terms of the judgment. Freeman on Judgments, sec. 61; *Weatherman* v. *Commonwealth,* 91 Va. 796, 22 S. E. 349. In this case it is not claimed that the clerk was negligent in the performance of his duties.

A trial judge not infrequently, after hearing oral arguments of counsel on motions to set aside a verdict, takes time to consider, later notifies counsel by letter, or otherwise, of his decision, and requests counsel for the successful party to draft an order making the decision effective, submit it to opposing counsel, and present it to the court for approval and entry. This practice has now been embodied in a rule of court. Rule 3:16, p. 23, of the Rules of the Supreme Court of Appeals, provides: ''Every draft of an order or judgment presented by counsel for entry shall either be endorsed by all counsel of record, or reasonable notice of the time and place of presenting it, together with a copy, shall be served by delivering or mailing to all counsel of record who have not endorsed it. Compliance with this Rule may be dispensed with by the court in its discretion.''

It is true that a judgment is the determination by the court of the rights of the parties. A written order or decree signed by the judge is evidence of the court's decision. It is generally held that the statute of limitations begins to run from the date of the entry of the judgment *nunc pro tunc* and not from the date on which judgment was pronounced, if no record had been

made of such pronouncement. *Borer* v. *Chapman,* 119 U. S. 587, 7 S. Ct. 342, 30 L. ed. 532; *Stampfle* v. *Bush,* 71 W. Va. 659, 77 S. E. 283.

The statute (sec. 8-338) provides, "Any certificate * * * may be tendered to the trial judge at any time * * * within sixty days from the time at which such judgment is entered.". The pronouncement of judgment is one thing, the entry of the judgment is another. It would create much confusion if interested parties were unable to rely upon the date upon which the judgment or order was entered and be forced to ascertain the date on which the judge pronounced his decision. We are in accord with the views expressed in *Baker* v. *Gaskins,* 125 W. Va. 326, 24 S. E. (2d) 277, 278, to the effect that "An order may not be entered *nunc pro tunc* if the rights of any party will thereby be affected adversely. * * * We decline to give a retrospective effect to this judgment order which would result in cutting off the plaintiff's time for applying for a writ of error."

The motion to dismiss, which is in effect a motion to disregard that part of the record contained in the certificate of exceptions, is overruled.

Elliott W. Spicer, hereinafter referred to as "plaintiff," instituted this action of ejectment to recover possession of 6 acres of land lying in Orange county, Virginia, and fully described in the proceedings. Mae J. Spicer, for herself and tenants, defended the action on the ground that she had acquired title to the 6 acres in controversy by adverse possession.

Plaintiff proved that on December 10, 1943, his father, J. Albert Spicer, conveyed the 6 acres to him, his two sisters, Edna Spicer Lushbaugh, Vertie Spicer Smith, and his brother, Bryant S. Spicer. In February, 1948, he acquired his brother's and sisters' interest in the land. He then traced title to a grant from the Commonwealth and rested. Mae J. Spicer, the principal defendant, introduced her evidence tending to prove title by adverse possession. On the issue thus joined the jury returned a verdict in favor of defendants, upon which verdict judgment was entered.

Plaintiff's main contention is that the evidence is insufficient to support the verdict returned against him.

The parties concede that the principles of law applicable were correctly stated in plaintiff's Instruction No. 1, to

which defendants offered no objection. This instruction informed the jury, in substance, that an owner of a legal title can not be deprived of his land by another's possession unless such possession had been actual, visible, notorious, exclusive, under claim of right, hostile, and continuous for the full statutory period.

The evidence considered, as we must consider it, in the light most favorable to defendants, may be stated as follows:

J. Albert Spicer, a Confederate veteran, was born in 1845 and died in 1948, at the ripe old age of 103 years. He was a miller by trade. Prior to 1918 he bought the 6 acres of land in controversy and operated a small mill thereon. At that time he owned an adjacent lot of ¾ of an acre on which he lived with his family. In addition to the four children named above, he had one other son, Fred A. Spicer, who moved to Washington, D. C. where he acquired "considerable wealth during and immediately after World War I."

On September 15, 1919, Fred A. Spicer acquired from his father, J. Albert Spicer, the ¾ of an acre tract by deed which was duly recorded in the clerk's office of the Circuit Court of Orange county. Shortly after acquiring this lot Fred A. Spicer bought several other tracts of land aggregating 165.76 acres, adjoining, or in the vicinity of, the land in question, on which he erected a dairy barn and other necessary outhouses. He employed a manager to operate the dairy farm.

He demolished the old dwelling on the ¾ acre lot and built a new, modern and elaborate home thereon. He continued to reside in Washington but he and his wife visited the farm, lived in the new house and there entertained their friends. He permitted his father and his family, as well as the farm managers he employed from time to time, to live in the new house.

Fred A. Spicer razed the old house used as a mill on the 6 acres and erected thereon, at a cost to him of between $6,000 and $8,000, a new mill house and equipped it with modern machinery. He installed therein a Delco plant which supplied electricity for the mill, dairy barn and other houses. Later he sold the Delco plant and bought electric power from a public utility company.

Fred A. Spicer died on March 30, 1933. By his will the land in question was devised to his wife, Mae J. Spicer, who continued to operate the farm and use the mill house and the 6 acres

of land as her husband had done. She permitted J. Albert Spicer to live on the premises under the same conditions and circumstances under which he had lived there during her husband's life.

Plaintiff concedes most of the foregoing facts, but contends that the possession of Fred A. Spicer during his life, and that of Mae J. Spicer after his death, was not such possession as amounted to exclusive dominion over the property, and that the claim of ownership was unknown to the father, J. Albert Spicer, who never surrendered possession of the property.

Defendant's evidence on the question of J. Albert Spicer's knowledge of her claim and that of her husband, and their dominion over the property, is as follows:

After Fred A. Spicer had built the new mill house, installed the modern machinery therein, and had built a large garage on the 6 acres, his father, by letter dated May 15, 1922, wrote him as follows:

"Dear Fed:

"Enclose find deed for mill.

"Carrie is no better. Bryant and Mr. Lillard went to see Ville today fishing.

"Did you hear John Braxton was dead.

"I want to go to Mr. Clemmers one day next week. We had a good rain yesterday—one more calf heifer.

"Well nothing much to write.

"Your dad,

J. A. Spicer."

The deed mentioned in the letter was never recorded. Mae J. Spicer testified that she saw the deed in her husband's possession several years prior to his death, and that after his death it was found among his papers, and was kept with them until 1936, when, in some way unknown to her, it was lost; that the lost deed conveyed the 6 acres of land to her husband, and was signed by J. Albert Spicer.

On March 20, 1927, J. Albert Spicer wrote Fred A. Spicer the following letter:

"Dear Fred:

"Just a line or two this morning it seems that you are indifferent about renewing the note—I am ignort in the matter the thing has come to an end—I don't think you have any idea

of paying it—or you would of done it in five years I have been borrying my own money for about five years—payed out more intrust on it than I have gotten and now the thing has come that I will have to do something that is not pleasant for me to do. I never thought that it would of come to this or the old rafters would have tumbled in the cogpit and roted you woud of been about six or eight thousand dollars better off and better satisfied.

Your Dad

J. A. Spicer."

The last sentence in this letter evidently refers to the old mill house and the fact that Fred A. Spicer had spent from $6,000 to $8,000 in the erection of a new building on the old mill site. The two letters are persuasive evidence to the effect that J. Albert Spicer knew that Fred A. Spicer claimed to be the sole owner of the 6 acres on which he had erected and operated the mill.

On November 12, 1930, Fred A. Spicer and Mae J. Spicer, his wife, in consideration of $715, conveyed to the Town of Orange a right of way for water and sewer lines across the 6 acres as well as across other lands owned by them. At the time the ditches for the water and sewer lines were dug, J. Albert Spicer was living in the house on the ¾ acre tract. He must have seen the employees of the town when they were constructing the lines across the property. Yet he did not demand, nor did he receive any part of the purchase price for the easement. It is reasonable to infer that if he had considered himself the owner he would have demanded part of the consideration paid his son.

On October 30, 1939, Mae J. Spicer, in consideration of the sum of $150, conveyed a part of the 6 acres of land to the Commonwealth of Virginia for use as a highway. At this time J. Albert Spicer was living in plain view, and within a few hundred feet, of the strip while employees for the Commonwealth were constructing the highway. He did not demand, nor did he receive, any part of the purchase price paid defendant.

Fred A. Spicer from 1922 to 1933, and Mae J. Spicer since 1933, used the 6 acres and the mill continuously. The mill was used to grind feed for the dairy herd and a place in which to store feed for the cattle. Mae J. Spicer and her predecessor in

title, at various times, leased the dairy farm, including the 6 acres and the mill house, to different parties. The leases were duly recorded. Prior to 1943 no one questioned the right of Mae J. Spicer, or her predecessor in title, to lease the properties in question, nor does it appear that any one questioned the right of the different lessees to use them under the terms of the leases. All taxes assessed against the property from 1922 to 1943, inclusive, were paid by Mae J. Spicer or her husband. From 1927 to 1943, the property was assessed on the land books of Orange county in the name of Fred A. Spicer or his devisee, Mae J. Spicer. They made all improvements which were placed upon the property, paid for the same, insured the property in their respective names for their own benefit, and paid the premiums.

Fred A. Spicer, from 1919 until his death in 1933, furnished his father, J. Albert Spicer, a home, support and maintenance. Mae J. Spicer, from 1933 to 1941, permitted J. Albert Spicer to live in her home free of charge, and otherwise contributed to his support and maintenance, but not to the extent that her husband had prior to his death. On this point she said that her husband "furnished him a home, room and board and clothes and provided for his comfort and welfare in every possible way." In 1941 or 1943 (it is not clear from the evidence which year) J. Albert Spicer moved from Orange to Washington and there lived with his daughter, Edna Spicer Lushbaugh, until his death in 1948.

While living with his daughter—that is, in December, 1943— J. Albert Spicer executed a deed of gift conveying the 6 acres (or that part of it remaining after conveying a strip to the Commonwealth) to his four children, as heretofore stated. When this deed was executed the grantor was 98 years of age. Doctor Scott testified that when he treated him professionally in the "middle thirties," he was in his dotage.

It is not surprising that a man of his advanced age and mental condition should have forgotten that, more than twenty years before, he had executed a deed (if he did execute such a deed) conveying the same property to his son, Fred A. Spicer.

Prior to January, 1944, Mae J. Spicer applied to the National Bank of Orange for a loan, offering as security the dairy farm, including the mill and the 6 acres. The attorney for the bank examined the title and reported that title to the 6 acres

(or rather the 5.08 acres remaining after the conveyance to the Commonwealth) was in the name of J. Albert Spicer and not Fred A Spicer.

Mrs. Lushbaugh testified that in 1943, while her father was living with her in Washington, it was reported to them that Mrs. Spicer was offering the mill property and other lands as security for a loan she was seeking. It was shortly after obtaining this information that J. Albert Spicer executed the deed of gift conveying the property to Mrs. Lushbaugh, her sister and brothers.

In 1944, Mrs. Lushbaugh and the three other grantees in the deed of gift instituted an action of ejectment against Mae J. Spicer and her tenants. It is said in the brief that this action was dismissed on motion of the plaintiffs after their attorney went to Washington and saw J. Albert Spicer.

In 1948, Mrs. Lushbaugh, her sister and brother executed a deed conveying whatever interest they might have in the property to Elliott W. Spicer, with the understanding that they would share in the recovery if Elliott W. Spicer was successful in this action. While this testimony has no direct bearing upon the rights of the parties it is reasonable to infer therefrom that at least three of the children of J. Albert Spicer have little faith in the merits of the claim now asserted.

The evidence offered by plaintiff to overcome the evidence on the question of adverse possession may be summarized as follows:

After 1922, and within the fifteen-year period, J. Albert Spicer used the new mill for the purpose of grinding grain for the neighbors, cultivated a garden and grazed a milch cow on the 6 acres. This it is claimed proved that the possession of Mae J. Spicer and her husband was not hostile or exclusive.

A study of this and other testimony in the case presents a picture of an old man who had spent the best part of his life as a miller, living on his son's bounty, in his son's house, close to and in sight of a mill, owned by the son and used by him in the operation of his dairy farm. The old gentleman, desiring to engage in some activity, from time to time visited the mill, assisted in grinding grain for cattle, and occasionally engaged in custom grinding for his neighbors. This was done with the permission, express or implied, of the farm manager, and with the consent and knowledge of the lessees of the premises.

Mae J. Spicer testified that J. Albert Spicer did cultivate a garden on the property prior to 1922, but did not use the land for that purpose between 1922 and 1941. She denied that a cow owned by J. Albert Spicer was kept or grazed on the 6 acres. She and her husband spent most of their time in Washington and visited the farm periodically. She said if she had known that her father-in-law was cultivating a garden or grazing a cow upon the land she would have raised no objection, as she and her husband were supporting him and if the produce from the garden and the milk from the cow were used in support of the family, their expenses would have been reduced *pro tanto*.

[5] Whether J. Albert Spicer's use, occasional or otherwise, of the mill property from 1922 to 1943, was under a claim of right and hostile to the possession of Mae J. Spicer, or her predecessor in title, was a jury question.

Plaintiff's final contention is that the trial court committed reversible error in admitting, over his objection, a notation or memorandum in the handwriting of Fred A. Spicer on the back of the letter J. Albert Spicer had written him on March 20, 1927, and heretofore copied. The substance of this notation was that Fred A. Spicer had bought and paid for all of his father's property in Orange county, had supported his father for the past twenty years, and had given his father a note for $2,000, with the understanding that it was not to be used "unless something happen to me." The notation contained expressions of irritation because the father and other members of the family had shown no appreciation for what Fred A. Spicer had done for him and them.

It appears from the record that when the attorney for defendant offered to introduce the letter of March 20, 1927, as a part of the evidence, he stated that the paper upon which it was written was badly mutilated and it was difficult to read. For that reason he asked permission to exhibit the original and file with the papers a typewritten copy. The attorney for plaintiff examined the original and demanded that it be introduced, upon which letter was written the notation in question. When the attorney for defendants offered to read this part of the letter to the jury, plaintiff interposed his objection, contending that it was a self-serving declaration and not admissible. He made no motion for this part of the exhibit to be excluded from the jury.

Plaintiff introduced two affidavits signed by J. Albert Spicer.

In the affidavit dated December 11, 1943, it is stated that J. Albert Spicer had not received payment for his home which he had conveyed to Fred A. Spicer; that Fred A. Spicer gave him a note for $2,000 payable on demand, which affiant had deposited in the Citizens National Bank at Orange, but it was lost or destroyed between Christmas of 1932 and March, 1933. Below the signature of the notary who took the oath appears the following: "I gave Edna power of attorney to collect. J. A. Spicer."

The other affidavit, dated January, 1945, Washington, D. C., recites that J. Albert Spicer had "deeded" the mill property to his four children; that he had never "deeded" the property "to any other person or persons;" that he had "deeded" a a tract of land upon which was erected his old home to Fred A. Spicer, and that Fred had "torn" down the old dwelling and built a new one; that Fred Spicer had given him a note for $2,000 and had never paid it. The old gentleman stated in the affidavit that he had been receiving a pension from the State of Virginia for many years; that he lived entirely independent of any of his children, and that if anybody had contributed to his support "they did so without my knowledge or consent, it was not necessary."

The notation made by Fred A. Spicer is a self-serving declaration, made by him, a party in possession and through whom defendant claims her title, before this controversy arose. It was not admissible as a part of the *res gestae* to prove any act of possession. It is hearsay and not admissible. The sworn statements of J. Albert Spicer are merely narratives of past occurrences, made after the controversy arose, and after he had executed the deed to his four children, and apparently for the purpose of manufacturing evidence favorable to them. *Pocahontas Fuel Co.* v. *Dillion,* 161 Va. 301, 170 S. E. 616.

The jury had before it the written statements of Fred A. Spicer and the contradictory sworn statements of J. Albert Spicer, none of which statements were admissible. Under the circumstances, the ruling of the court on the admission of evidence was harmless error.

The judgment of the trial court is affirmed.

*Affirmed.*