# Richmond

COMMONWEALTH OF VIRGINIA, MARINE RESOURCES COMMISSION V.
WILLIAM R. FORBES AND HAZEL W. FORBES.

June 11, 1973.

Record No. 8121.

Present, All the Justices.

*James E. Moore, Assistant Attorney General (Andrew P. Miller, Attorney General; Gerald L. Baliles, Deputy Attorney General; Daniel E. Rogers, II, Assistant Attorney General,* on brief), for appellant.

*L. S. Parsons, Jr.* (*L. S. Parsons; Peter W. Rowe; Parsons, Steffen & Moore; Stackhouse, Weinberg & Stewart,* on brief), for appellees.

POFF, J., delivered the opinion of the court.

On March 3, 1971 the Commonwealth of Virginia, Marine Resources Commission (Commonwealth), filed a bill of complaint against William R. Forbes and Hazel W. Forbes (defendants) and others complaining that defendants had, without statutory authority or a Commission permit and in violation of Code § 62.1-3, deposited a fill upon state-owned subaqueous beds of the Eastern Branch of the Elizabeth River in Norfolk and praying for an injunction under Code § 62.1-3.1 enjoining further fill activities and commanding removal of the encroaching fill. Commonwealth's bill also alleged certain unlawful environmental impacts, but by agreement of counsel and consent of the chancellor, litigation of those allegations was deferred and the trial limited to the issue raised by defendants' claim of statutory right to fill.

By letter opinion dated November 19, 1971 and final decree entered on December 21, 1971 the chancellor dismissed all parties defendant except the Forbeses, denied the prayer for injunctive relief and dismissed the bill of complaint. We granted Commonwealth an appeal.

■ Defendants filed a motion to dismiss the appeal as improvidently granted on the ground that Commonwealth's petition was not filed within four months after rendition of final judgment as required by Rule 5:24 and Code § 8-463. The petition for appeal was filed on April 19, 1972. Defendants contend that final judgment was rendered five months earlier in the chancellor's letter opinion and that entry of the decree was merely a consequential formality. We do not agree. The letter opinion requested counsel to "prepare and submit sketch of an appropriate decree". In a subsequent letter the chancellor asked for "some expressions of counsel as to whether they desire a further hearing in the matters raised by the pleadings". Clearly, the chancellor did not regard his first letter a final judgment. As we have said in reference to a similar letter opinion:

"This is not a judgment. It is notice to counsel of the decision of the judge so that they might prepare the proper order making the decision effective." *Spicer* v. *Spicer,* 192 Va. 105, 109, 63 S.E.2d 773, 776 (1951).

Final judgment was rendered within the meaning of the rule and the statute when the final decree was entered, and defendants' motion to dismiss the appeal is denied.

Campostella Realty Corporation subdivided and platted Campostella Heights. The plat showed some streets and lots partly or wholly below the mean low water mark of the tidal waters of the Elizabeth River. By appropriate notations on the plat, the owners reserved the fee in all streets and all riparian rights. By deed dated July 18, 1967 Campostella Yacht Basin, Incorporated, and Pembroke Holding Corporation conveyed to defendants all twenty lots in Block V; all eight lots in Block Y; and Lots 45, 46, 52, and 53 in Block H; together with "riparian rights appurtenant to said Lots in Blocks V and Y, and riparian rights appurtenant to Lots 45 through 53, in Block H, on said plat; it being the intention to convey the riparian rights appurtenant to said last eight (sic) lots which have not been conveyed by Campostella Yacht Basin, Incorporated, by deeds of record . . . ."

By deed of correction dated January 14, 1969 the same grantors conveyed to defendants "all the right, title and interest of the parties of the first part in and to all of the avenues, streets, roads and lanes shown on the Amended Plat of Campostella Heights . . . it being the intention of this deed . . . to convey to the parties of the second part such interest, if any, as the parties of the first part may have acquired to the above described property . . ." by certain named deeds.

Defendants also acquired Lots 2 and 4 in Block S from a third party.

Because of the size of the map showing the lots, streets, tidal marks and area of the fill, the details of a reproduction in the pages of this opinion would not be legible. The two principal intersecting streets are Arlington Avenue running east and west and Waltham Street running north and south. In the northwest quadrant of the intersection lies Block H; in the northeast, Blocks V and Y; and in the southeast, Block S.

According to this map, at the time the property was subdivided all lots in Block S lay entirely south of and above the low water mark except Lots 20, A, B, 30, 32, 33, and 34 whose northern extremities were under water; all lots in Block V (except a portion of Lot 1), the northern portions of all lots in Block Y, and the northern portions of Lots 44 through 53 in Block H lay north of and below the low water mark; all of Waltham Street south of the intersection and part north of the intersection separating Blocks H and V was highland with the northern extension under water; all of Arlington Avenue

west of the intersection and the southern half of the portion east of the intersection (except the submerged area adjacent to Lots 20, A, B, 30, 32, 33, and 34 in Block S) was highland.

The map shows that the fill covered parts of defendants' four lots in Block H and Lots 1 through 16 in Block V; a portion of the northern extremity of Lot B in Block S (owned by others); parts of Lots 44 and 51 in Block H (owned by others); a portion of Waltham Street north of the intersection; and most of Arlington Avenue east of the intersection between Blocks V and S.

Commonwealth contends that the fill below the low water mark in the streets, the fill on lots owned by defendants which were entirely submerged when platted, and the fill on lots owned by others were unlawful encroachments on state-owned lands.[1] Defendants contend, as the chancellor found, that reading the deed and the deed of correction together, they acquired riparian rights across the entire tract and, as "riparian owners" within the meaning of the statute, enjoyed statutory authority to fill.

In Virginia, riparian rights appurtenant to highland, whether adjacent to inland streams or tidal waters, may be severed and alienated as a separate property interest. *Thurston* v. *City of Portsmouth*, 205 Va. 909, 140 S.E.2d 678 (1965). Since all riparian rights were reserved and severed from the land when the plat was recorded, whatever riparian rights defendants acquired were severed riparian rights when acquired.

It therefore becomes necessary first to decide what statutory right to fill is enjoyed by owners of riparian rights severed from the highland. More precisely, the question is whether an owner of severed riparian rights has a right to fill equivalent to that of an owner of highland with appurtenant riparian rights.

Code § 62.1-3 creates a right which did not exist at common law, viz., the right to fill subaqueous beds. It conditions the new right upon either (1) a permit of the Marine Resources Commission or (2) statutory authority. It then grants statutory authority in the following language:

"... Statutory authority is hereby conferred for the doing of such acts as are necessary for ... (6) fills by riparian owners opposite their property to any lawfully established bulkhead line ...."

---

[1] Under Code §§ 62.1-1, -2, as at common law, the Commonwealth holds title to the ungranted subaqueous beds of all bays, rivers, creeks and shores of the ocean within its boundaries, and subaqueous beds are those below the "low water mark". As the statute was amended in 1972, the line of demarcation is the "mean" low water mark.

Defendants contend that "riparian owners" include all owners of riparian rights, whether appurtenant to highland or severed from highland. Citing several cases decided by this court prior to 1960 validating severed riparian rights as a separate property interest, they argue that when the General Assembly passed this statute in 1960, it intended to confer the new right upon both types of riparian owners.

In construing legislative intent, we must give words and phrases not specifically defined in the statute their commonly accepted meaning in the context in which they are used. Pointing to a riparian owner's right to "accretions or alluvium" and his right "to build a pier or wharf out to the navigable water" as those rights are defined in *Taylor v. Commonwealth*, 102 Va. 759, 773, 47 S.E. 875, 880, 881 (1904), defendants construe "property" to include an interest in the bottom or soil under the water. Next, they construe "opposite" such interest to mean set over against such interest "either horizontally or vertically in any plane or in any direction".

In the context of this statute, such a construction of these words and their interrelationship tortures the commonly accepted meaning. As a legal concept, "property" is a body of rights, including a right to use. But "property" as the General Assembly used it in this statute clearly refers not to an amorphous concept but to a *res*, the *ripus*, the bank adjacent to a watercourse. And plainly "opposite" was not intended to be synonymous with "upon". So construed, the clause "to any lawfully established bulkhead line" would be meaningless.

We are of the opinion that when the General Assembly acted in 1960, it was aware that Virginia law recognized two types of riparian owners, that it chose between the two, and that it conferred the new right to fill only upon the owner of highland with riparian rights appurtenant thereto. If the public policy fixed by its act is to be changed, the General Assembly must make the change.[2]

In finding that defendants acquired by the deed and deed of correction riparian rights across the entire tract, the chancellor erred. The deed conveys named lots, riparian rights related to those lots, and riparian rights related to five lots owned by others. The deed of correction conveys all "right, title and interest" in the streets. Nothing is said in either instrument about riparian rights related to

---

[2] While *Thurston v. City of Portsmouth, supra,* involved a fill by an owner of severed rights, the right of such owner to fill was not an issue before the court; the Commonwealth was not a party and the complaining highland property owner without riparian rights had no standing to sue to prevent the fill.

any other lot on the plat, and the intent of the parties must be determined from the four corners of the two instruments. *James River and Kanawha Power Co. v. Old Dominion Corp.*, 138 Va. 461, 122 S.E. 344 (1924). Accordingly, defendants acquired no riparian rights to Lot 44 in Block H or Lot B in Block S.

As we have said, riparian rights related to the lots named in the deed were severed riparian rights, and so long as they remain severed, they confer no right under the statute to fill. However, when a property interest severed by an antecedent owner from the fee is acquired by a subsequent owner of the limited fee, the two property interests merge to revive the fee simple absolute. As we said in *Newsome v. Scott*, 200 Va. 833, 840, 108 S.E.2d 369, 374 (1959), quoting from *Garland v. Pamplin, et als.*, 73 Va. (32 Gratt.) 305, 315 (1879):

> " 'Merger is described as the annihilation of one estate in another. It takes place usually when a greater estate and a less coincide and meet in one and the same person, without any intermediate estate, whereby the less is immediately merged—that is, sunk or drowned in the greater. To this result, it is necessary that the two estates should be in one and the same person, at one and the same time, in one and the same right. 2 Bouv. Institutes, 375, No. 1989; 2 Minor's Inst. (2d ed.), 368, *et seq.*' "

By the deed of July 18, 1967 defendants acquired both the limited fee to Lots 45, 46, 52 and 53 in Block H, Lot 1 in Block V, and all eight lots in Block Y and the severed riparian rights related to those lots. Applying the doctrine of merger, the two property interests merged, the fee simple absolute was revived, and since part of each of these lots was highland when platted, defendants acquired authority by operation of the statute to fill opposite that highland. Severed riparian rights related to Lots 47, 48, 49, 50, and 51 in Block H (the highland to which is owned by others) conferred upon defendants no statutory authority to fill on or opposite such lots. Any right they acquired to fill on or opposite Lots 2 through 20 in Block V they acquired, if at all, not from riparian rights conveyed by the July 18, 1967 deed but from riparian rights related to highland in Arlington Avenue opposite which they lie.

We consider now whether defendants had statutory authority to fill opposite highland in the streets acquired by the deed of correction of January 14, 1969. Riparian rights to the entire tract (includ-

ing highland in the streets) and the fee in the streets were separate interests, separately reserved on the plat to Campostella Realty Corporation. The plat was recorded, but the streets were never dedicated, never accepted by the City of Norfolk as public ways, and, being partly submerged, never developed or used as private ways by lot owners. The right of lot owners to use the streets was subject to whatever use might be made by owners of riparian rights severed therefrom.

Since the record does not contain the two deeds by which defendants' grantors acquired what they conveyed to defendants, it is unclear what riparian rights related to streets they had title to convey. In oral argument the Commonwealth said they owned only the land in the streets. But if defendants' grantors owned both the fee in the streets and the riparian rights once appurtenant thereto and severed therefrom, the two property interests became merged in defendants' grantors. If so, when they conveyed, without expressly reserving riparian rights, all "right, title and interest" in the streets to defendants, defendants acquired the revived fee simple absolute. See the general rule acknowledged in *Thurston* v. *City of Portsmouth*, 205 Va. at 915, 140 S.E.2d at 682. Such title would embrace riparian rights restored to highland in the streets and vest in defendants statutory authority to fill submerged areas opposite such highland, including submerged areas in the streets opposite such highland, submerged areas in platted lots opposite such highland, and submerged areas opposite such lots to the bulkhead line. Whether there was in fact such a merger must be adjudicated on remand.

Except as to dismissal of parties defendant other than the Forbeses, the judgment is reversed, the bill of complaint as against the Forbeses is reinstated on the docket, and the case is remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*