815 A.2d 828

**CONRAD/DOMMEL, LLC,**

v.

**WEST DEVELOPMENT COMPANY, et al.**

**No. 01273, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Jan. 29, 2003.

---

240

244

Michael E. Leaf (Robert D. Porter and Hodes, Ulman, Pessin & Katz, P.A., on the brief, for Tome's Landing), Eric E. McLauchlin (John J. Gessner and Gessner, Snee, Mahoney & Lutche, P.A., on the brief, for Conrad/Dommel), Bel Air, for appellants.

Marvin I. Singer (Michael H. Mannes, on the brief), Baltimore, for appellees.

Argued before KENNEY, ADKINS, and CHARLES E. MOYLAN, JR. (Ret'd, specially assigned), JJ.

KENNEY, Judge.

Appellants/cross-appellees, Conrad/Dommel, LLC ("Conrad/Dommel"), Tome's Landing Condominium Association, Incorporated (the "Condominium"), and Tome's Landing Yacht

Club, Inc. (the "Yacht Club"), appeal the decision by the Circuit Court of Cecil County that Tome's Landing Corporation ("TLC"), which is not a party to this appeal, had transferred certain expansion rights to appellee/cross-appellant West Development Company ("West"). West appeals the circuit court's ruling that TLC had not transferred its riparian rights to West but, rather, that Conrad/Dommel had obtained those riparian rights by virtue of a foreclosure sale. Appellants pose five questions on appeal, which we have consolidated: [1]

Did West acquire the expansion rights which TLC had acquired pursuant to the Marina Cross Operating Agreement?

Appellee poses one question on appeal:

Did the circuit court err in awarding the riparian rights to Conrad/Dommel?

For the reasons set forth below, we affirm the trial court's ruling with respect to the issue of riparian rights, but we vacate the order with respect to the expansion rights and remand this case for further proceedings not inconsistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

This case concerns property located along the Susquehanna

---

1. Appellants' questions were:

A. Did the circuit court err by ruling that there exist valid "developer rights," which could be assigned to appellee?

B. Assuming, *arguendo*, that valid "developer rights" were assigned to the appellee, did the circuit court err in failing to limit the scope of those rights?

C. Assuming, *arguendo*, that valid "developer rights" were assigned to the appellee, did the circuit court err in failing to recognize the impossibility of exercising those rights?

D. Did the circuit court err by failing to render a proper declaration of the rights of the parties in and to the "developer rights" described in the Marina Cross Operating Agreement?

E. Assuming, *arguendo*, that valid "developer rights" exist, did the circuit court err by failing to declare that they had been conveyed to the trustees under the first deed of trust before the purported assignment of them to appellee?

River in Port Deposit, Maryland, shown as follows: [2]

All of the lots and parcels were originally owned by United Dominion Industries, Inc. ("UDI"), TLC's parent corporation. We have constructed a chart of the various transfers that took place and have attached it to this opinion as an Appendix. On May 20, 1993, a document entitled Declaration of Easements, Covenants and Restrictions was filed in the land records for Cecil County. In a separate document filed that same day, UDI deeded to TLC Lots 3 and 4 and Parcel A in fee simple. That deed contains the following language:

WITNESSETH, that in consideration of the sum of One Dollar ($1.00) (no actual consideration), Grantor [UDI] does hereby grant and convey unto Grantee [TLC], its successors and assigns, that certain lot[s] of ground situate and lying in Port Deposit, Maryland (the "Property") and more specifically described as follows:

Those parcels of land shown as Lots 3 and 4 and Parcel A on a final [recorded] subdivision plat of Tome's Landing

. . .

SUBJECT TO all matters shown on the Plat, the terms and provisions of a Declaration of Easements, Covenants and Restrictions recorded or intended to be recorded immediately prior hereto, and all other matters of record.

TOGETHER WITH the buildings and improvements thereon and all rights, roads, alleys, ways, waters, privileges, appurtenances and advantages to the same belonging or appertaining.

AND FURTHERMORE TOGETHER WITH all riparian rights and privileges belonging or appertaining to the real

---

2. This disposition of the property was taken from the record. We have altered it to show the lot numbers and the parcel references.

property shown on the Plat and known as Lots 1 through 10, including Lot 6A, Parcel A–1, Parcel A, Parcel B, Parcel C and Parcel D, including all riparian rights and privileges in and to the waters of the Susquehanna River.

TO HAVE AND TO HOLD the said property unto and to the use of the Grantee, its successors and assigns, in fee simple.

On May 26, 1993, TLC filed a Declaration Establishing a Plan for Condominium Ownership (the "condominium plan").[3] That same day, TLC granted "certain limited riparian rights" to the Yacht Club and entered into a Marina Cross Operating Agreement ("MCOA") with the Yacht Club and the Condominium. The riparian rights agreement read:

The Developer [TLC] wishes to grant and convey to the [Yacht] Club **certain limited riparian rights to construct, place and maintain certain breakwater piers, debris barrier piers and/or other marginal walkway piers and gangplanks.** From time to time, the Developer may also convey to the [Yacht] Club additional riparian rights necessary to construct, build, use and enjoy (i) additional piers and docks containing marina slips for use by members of the [Yacht] Club, or (ii) additional breakwater piers and/or debris barriers, and/or (iii) such other riparian structures or activities as the Developer may approve.

NOW, THEREFORE, WITNESSETH that in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration (no actual consideration paid or to be paid), the receipt and sufficiency of which is hereby acknowledged, the Grantor does hereby grant and convey unto the Club, its successors and assigns, those certain riparian rights further described on Exhibit A.[1] [Emphasis supplied.]

---

**3.** The declaration was amended each time UDI deeded additional lots to TLC, as discussed below.

**4.** Exhibit A is a drawing depicting piers, slips, marginal walkways, and gangplanks. The drawing contains the following notation:

The condominium plan called for the creation of a Condominium Marina, which was to be a limited common element owned by the condominium unit owners. The MCOA called for the creation of a "Club Marina," for non-unit owners who purchased a club membership. The MCOA also granted cross-easements:

(a) The [Yacht] Club, the Condominium and the Developer [TLC] hereby grant and convey to each other an easement, right and/or privilege (the "easement"), in common with each other, for the full non-exclusive beneficial use and enjoyment of the Marinas, as they presently exist and as they hereafter may be enlarged, substituted and modified, for the purpose of enabling each other to (i) develop, maintain, repair and replace the Docks, Breakwater Piers and Piers or any other portions of the Club Marina Facilities or the Condominium Marina Facilities; (ii) install, maintain, repair, and replace, extend and enjoy the use and benefit of any and all pipes, ducts, wires, piers, utilities and such other facilities and easements owned by the [Yacht] Club or the Condominium, as may be reasonably necessary for the full use and enjoyment by the [Yacht] Club, the Condominium or the Developer of the Marinas; (iii) fully use and enjoy the Expansion Rights, and (iv) enter upon, in or over any portion of the Marinas for the purpose of ingress and egress by an Occupant to his or her Slip, and for the purpose of using and enjoying any rights, including Expansion Rights, set forth in this Agreement.

(b) The [Yacht] Club, the Developer and the Condominium hereby grant, convey and assign to each other the right to use in common all riparian rights and privileges held, owned or enjoyed by any of them.

(c) The [Yacht] Club, the Developer and the Condominium hereby grant, convey and assign to each other the right

---

The Developer grants and conveys **all riparian rights necessary to build, use, maintain and enjoy the breakwater piers, marginal walkway and gangplank shown by hatchmarks herein and noted by arrows.** [Emphasis supplied.]

to use in common all permits, licenses and other rights held by any of them which are reasonably necessary for the full use and enjoyment of the Marinas.

The provisions of the MCOA relative to the "expansion rights" at issue in this case read as follows:

*Expansion Rights.*

(a) *Statement of Intent.* It is intended that the Club Marina Facilities and the Condominium Marina Facilities from time to time may be expanded by the Developer [TLC], in order, *inter alia,* to accommodate additional Members and/or Unit Owners, to build fuel piers or transient slip piers, or for other purposes. Such expansion may take place by extension of existing Piers, by the construction of new Piers, or otherwise. Additionally, the Developer may locate Condominium Marina Facilities at the end of any existing Pier that has Club Marina Facilities, and vice-versa. The Developer may also construct new Piers, Docks or Slips which are not a part of the Marinas in the riparian areas adjacent to or part of the Marinas (herein, the "Developer Marina"). If constructed, the Developer Marina shall be entitled to the benefit of all easements granted in this Agreement. The Developer Marina may include *inter alia,* the Pier intended for transient slips which may be shown on the Marina Plat, and any other pier constructed as part of, or inside of (landward of) breakwater piers or debris barriers owned by the [Yacht] Club, the Condominium or the Developer.

The Developer and the other parties wish to provide for the efficient, integrated operation of all Slips, Piers and Docks in the Marinas, the Developer Marina and in the waters adjacent thereto, and to ensure the Developer the maximum rights to enjoy and develop such Slips, Piers and Docks (such rights as provided in this Agreement are herein collectively referred to as the "Expansion Rights").

(b) *Right to Build, Enlarge and Extend the Marinas or any Developer Marina.* The Developer shall have the easement, right and privilege from time to time to extend or

build any Pier of the Marinas or the Developer Marina; to attach additional Piers, Slips and Docks to any Pier existing from time to time in order to expand the Marinas or to construct a Developer Marina; to increase the number of Piers, Slips and Docks in any portion of the Marinas or the Developer Marina; to use existing or install new utility lines, cables, pipes or the like in the Marinas or in the Developer Marina, and to repair, replace or reconstruct same from time to time, to the extent reasonably necessary or beneficial for the full use and enjoyment of the Expansion Rights, provided, however, that any utilities consumed by the Developer, its successor or assigns in the Developer Marina shall be paid for by the Developer in accordance with any meter or submeter or on any other equitable bases of allocating utility use; and to use any portion of the Marinas for access to Slips, Docks and Piers of the [Yacht] Club, the Condominium and/or of the Developer.

(c) *Repair of Damages; No Interference, Etc.* In the event the Developer shall exercise any of its Expansion Rights from time to time, Developer shall (a) perform all work in a good and workmanlike manner in accordance with all federal, state and local laws, rules and ordinances, (b) promptly repair any damage done to the Marinas, and (c) not impair in any material way access to or enjoyment of any Slip by any Unit Owner or Member.

On September 27, 1993, UDI deeded Lot 5 to TLC in fee simple. Lot 2 was deeded to TLC in fee simple on June 15, 1994. On September 29, 1994, a number of deeds were executed by UDI in furtherance of TLC's development plan. TLC gained fee simple ownership in Lots 1, 7, 8, and 9, and Parcels A–1, B, C, and D in one deed, and Lot 6A was separately deeded to it. Lot 10 was deeded to Tome's Main Street, Inc., and Lot 6 was deeded to Tome's Commerce Center, Inc. According to those deeds, both Tome's Main Street, Inc., and Tome's Commerce Center, Inc. were subsidiaries of UDI. As a result of the conveyances to date, the ownership of the subject property was divided among TLC, Tome's Main Street, Inc., and Tome's Commerce Center, Inc.

Two deeds of trust were entered into on September 29, 1994. In the first (the "Columbia deed of trust"), TLC, Tome's Commerce Center, Inc., and Tome's Main Street, Inc. were the grantors, The Columbia Bank ("Columbia Bank") was the beneficiary, and Charles C. Holman and Scott C. Nicholson were the trustees. The Columbia deed of trust secured a $1.5 million dollar loan from the bank, and provided, in pertinent part:

NOW, THEREFORE, THIS DEED OF TRUST WITNESSETH:

THAT, Grantor, in consideration of the premises herein contained and of One Dollar ($1.00) paid by Trustees, the receipt of which, before the sealing and delivery of these presents, is hereby acknowledged, has GRANTED and CONVEYED, and does hereby GRANT and CONVEY unto Trustees, in fee simple, that real property situate, lying and being in Cecil County, State of Maryland, more particularly described in Exhibit A [5] attached hereto and made a part hereof (hereinafter the "Land").

---

**5.** Exhibit A reads, in pertinent part:

*PARCEL NO. 1*

BEING KNOWN AND DESIGNATED as Condominium Units 201, 202, 203, 204, 205, 207, 208, 209, 210, 211, 213, 214, 215, 216, 217, 218, 219, 220. 221, 222, 223, 224, 225 and 226 in Phase IV, Condominium Units 307 and 319 in Phase I, Condominium Units 418, 420 and 421 in Phase II and Condominium Units 503, 506, 511, 513, 516, 517, 518 and 519 in Phase III, TOME'S LANDING, a Condominium, as established as a condominium regime pursuant to the provisions of the Real Property Article, Title 11, Section 11–101, et seq[.], of the Annotated Code of Maryland, and pursuant to Declaration and By Laws made by Tome's Landing Corporation ..., First Amendment to Declaration ..., Second Amendment to Declaration ..., Third Amendment to Declaration ... and any amendments thereto [all recorded in the Land Records of Cecil County], and as shown on the [recorded] condominium plats....

TOGETHER WITH the Marina Slips Limited Common Element known as Marina Slip Nos. B–5, B–6, B–13, B–14, C–4, C–10, C–11, D–3, D–4, D–5, D–6, D–9, D–11, D–13, D–14, D–15, E–3, E–5, E–6, E–7, E–8, E–9, E–10 and E–11.

TOGETHER WITH appurtenances and advantages thereunto pertaining, including an undivided percentage interest in the common elements, common expenses, and common profits in the regime as set forth in said Declaration, By–Laws and Plats referred to above.

TOGETHER with all right, title and interest of Grantor, including any after-acquired title or reversion in and to the beds of the ways, streets, avenues and alleys adjoining the Land; and

TOGETHER with all buildings and improvements of every kind and description now or hereafter erected or placed in or upon any interest or estate in the Land, and used or usable in connection with any present or future operation of the Land and now owned or hereafter acquired by Grantor, and/or in which Grantor may now have or hereafter acquire rights, and all fixtures including, but not limited to, all gas and electric fixtures, engines and machinery, radiators, heaters, furnaces, heating equipment, steam and hot water boilers, stoves, ranges, elevators, motors, bathtubs, sinks, water closets, basins, pipes, faucets and other plumbing and heating fixtures, mantels, refrigerating plant and refrigerators, or other mechanical or otherwise, cooking apparatus and appurtenances, furniture, shades, awnings, screens, blinds and other furnishings; it being mutually agreed that all the aforesaid property owned by said Grantor and placed by it on the Land shall, so far as permitted by law, be deemed affixed to the realty and covered by this Deed of Trust; and

TOGETHER with all articles of personal property now or hereafter attached to or used in and about the building or buildings now erected or hereafter to be erected on the Land which are necessary to the complete and comfortable use and occupancy of such building or buildings for the purposes for which they were or are to be erected, including all goods and chattels and personal property as are used or furnished in operating a building or the activities conducted therein, and all renewals or replacements thereof or articles and substitutions therefor, whether or not the same are, or

*PARCEL NO. 2*
BEING KNOWN AND DESIGNATED as Lot Nos. 1, 6, 7, 8, 9 and 10, and Parcels A, A–1, B, C and D, all as shown on the [recorded] plats[.]

shall be attached to said building or buildings in any manner; and

TOGETHER with all building and construction materials and equipment now or hereafter delivered to the Land and intended to be installed therein; and

TOGETHER with all leases, rents, profits, and benefits to the extent they may constitute accounts, including any deposits of tenants to secure payment of the same and performance of the terms and conditions of any oral or written lease, with respect to the leasing of all or any portion of the Land or improvements thereon; and all of the accounts of Grantor, including **without limitation,** all notes, accounts receivable, drafts, acceptances and similar instruments and documents, and **all contract rights;** and

TOGETHER with all plans and specifications, surveys and surveyor's reports, engineer's and architect's reports, diagrams and drawings; sewer and water taps, allocations and agreements for utilities, bonds, utility deposits, refunds of fees or deposits paid to governmental authorities; licenses, permits, approvals and applications therefor from governmental authorities; contracts, subcontracts, service contracts, books, records, reports, accounting records, invoices, change orders, correspondence, diagrams, drawings, schematics, sales and promotional materials, **wherever located and whenever created, compiled or made with respect to the Land or the improvements thereon;** and

TOGETHER with all of the proceeds of the voluntary or involuntary conversion of the real and personal property secured by this Deed of Trust or any part of such property into cash or liquidated claims, whether by way of condemnation, insured casualty, judgment or otherwise; and

TOGETHER with all of Grantor's right, title and interest in and to all amounts that may be owing at any time and from time to time by the Beneficiary to Grantor in any capacity, including, but not limited to, any balance or share belonging to Grantor of any deposit or other account with the Beneficiary.

(The Land, together with all of the property described above, are herein referred to as the "Trust Property".)

TO HAVE AND TO HOLD the same unto Trustees and the successors in interest of Trustees forever in fee simple. [Emphasis supplied.]

In the second deed of trust ("UDI deed of trust"), TLC, Tome's Commerce Center, Inc., and Tome's Main Street, Inc. were the grantors, UDI was the beneficiary, and B. Bernard Burns, Jr. and Robert E. Drury were the trustees. This deed of trust secured $9,086,133, and, in pertinent part, states:

*WITNESSETH*:

WHEREAS Grantor is the owner of a fee estate in the premises described in *Exhibit A* attached hereto (the "Premises").[6]

NOW THEREFORE, to secure (i) the payment of an indebtedness in the principal sum of Nine Million Eighty–Six Thousand One Hundred Thirty–Three and 00/100 Dollars ($9,086,133.00) ... Grantor has given, granted, bargained, sold, conveyed, confirmed and assigned, and by these presents does give, grant, bargain, sell, convey, confirm and assign, unto Trustees in trust forever, in fee simple, with power of sale or assent to decree, all right, title

---

**6.** Exhibit A provides, in pertinent part:

Those parcels of land shown as Lots 1, 6, 6A, 7, 8, 9 and 10, and Parcels A, A–1, B, C and D on a final subdivision plat of Tome's Landing. . . .

Subject to all matters shown on the Plat, the terms and provisions of a Declaration of Easements, Covenants and Restrictions. . . .

**Together with all riparian rights and privileges belonging or appertaining to the real property shown on the Plat, including all riparian rights and privileges in and to the waters of the Susquehanna River.**

Unit nos. 201–205, 207–211, 213–226, 307, 319, 418, 420, 421, 503, 506, 511, 513 and 516–519 of Tome's Landing, as described in a Declaration Establishing A Plan For Condominium Ownership for Tome's Landing, a Condominium, ... (as amended, the "Declaration"), together with all common elements applicable thereto, and the Marina (as defined in the Declaration) and those marina slips owned by Grantor on the date first above written, together with all common elements applicable thereto. [Emphasis supplied.]

and interest of Grantor now owned, or hereafter acquired, in and to the following property, rights and interests (such property, rights and interests being hereinafter collectively referred to as the "Trust Property"):

(a) the Premises;

(b) all buildings and improvements now or hereafter located on the Premises (the "Improvements");

(c) all of the estate, right, title, claim or demand of any nature whatsoever of Grantor, either in law or in equity, in possession or expectancy, in and to the Trust Property or any part thereof;

(d) all easements, rights-of-way, gores of land, streets, ways, alleys, passages, sewer rights, waters, water courses, water rights and powers, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances of any nature whatsoever, in any way belonging, relating or pertaining to the Trust Property, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Premises to the center line thereof;

(e) all fixtures, fittings, furnishings, appliances, apparatus, equipment and machinery, and all articles of personal property located in or upon any interest or estate in land herein conveyed or any part thereof and used or usable in connection with the Trust Property;

(f) all judgments, awards of damages and settlements hereafter made as a result of or in lieu of any taking of the Trust Property or any part thereof or interest therein under the power of eminent domain; and

(g) all proceeds of the conversion, voluntary or involuntary, of any of the foregoing into cash or liquidated claims.

TO HAVE AND TO HOLD the above granted and described Trust Property unto and to the proper use and benefit of Trustees, and the successors and assigns of Trustees forever;

IN TRUST, to secure the payment to Beneficiary of the Debt at the time and in the manner provided for its payment in the Notes and in this Deed of Trust;

This deed of trust was expressly subordinate to the Columbia deed of trust.

On January 23, 1996, the grantors entered into a loan modification agreement with Columbia Bank, increasing the amount of the loan to three million dollars. The same land was encumbered in the modification agreement, with the exception of condominium units and marina slips that had been sold and released from the Columbia deed of trust.

On July 8, 1998, apparently in conjunction with its default on the loan, TLC assigned to Columbia Bank "any and all rights, reservations, easements, interests, exemptions, privileges and powers which Assignor may have as the Developer" under the condominium plan. Columbia Bank foreclosed on the property, and Conrad/Dommel bought the property at a foreclosure sale. The foreclosure deed was executed on September 11, 1998 (the "foreclosure deed"),[7] and states:

THIS DEED, made this 11 day of September, 1998, by and between CHARLES C. HOLMAN and SCOTT C. NICHOLSON, Trustees as hereinafter mentioned (collectively, "Grantors"), and CONRAD/DOMMEL, LLC, a Maryland limited liability company ("Grantee").

\* \* \*

WHEREAS, by virtue of a certain Deed of Trust and Security Agreement dated September 29, 1994, recorded among the Land Records of Cecil County ... (as modified by a Loan Documents Modification Agreement dated January 22, 1996 and recorded ... ), and filed in the above-mentioned cause, the said Trustees were empowered to sell the property designated in said proceedings, and the said Trustees, after complying with all the requisites of said

---

7. None of the foreclosure documents, except the foreclosure deed, was included in the record.

Deed of Trust, and complying with the Maryland Rules of Procedure, did on July 9, 1998 sell unto the said Grantee (as substituted purchaser pursuant to an Order dated August 19, 1998), for the sum of TWO MILLION TWO HUNDRED SEVENTY–FIVE THOUSAND DOLLARS ($2,275,000.00), current money, that property (the "Property") situate in Cecil County, State of Maryland, as more particularly described in Exhibit "A" [8] attached hereto.

TOGETHER with the buildings and improvements, thereupon erected, if any, and the rights, alleys, ways, **waters,** privileges, appurtenances and advantages belonging or appertaining thereto.

WHEREAS, the aforesaid sale having been duly reported to and ratified and confirmed by the said Circuit Court for Cecil County on September 2, 1998, and the purchase

---

8. Exhibit A provides, in pertinent part:

Legal Description: All that property and improvements (if any) thereon situate in Cecil County, State of Maryland, and described as follows, all in fee simple:

*The "Condominium Unit(s)":* BEING KNOWN AND DESIGNATED as Condominium Units 201, 204, 205, 207, 215, 216, 218, 219, 220, 221, 223 and 224, all in Phase IV, and Condominium Units 418 and 421, in Phase II and Condominium Units 516 and 518, in Phase III, all in Tome's Landing, a Condominium . . .

TOGETHER WITH appurtenances and advantages thereunto pertaining, including an undivided percentage interest in the common elements, common expenses, and common profits in the regime as set forth in said Declaration, By Laws and Condominium Plats referred to above.

*The "Restaurant Building":* BEING KNOWN AND DESIGNATED as Lot NO. 6, . . .

*"Commercial Building" also known as "Tract Two–B"*

\* \* \*

*The "Condo Building Pads":* BEING KNOWN AND DESIGNATED as Lot Nos. 1, 7, 8 and 9 . . .

\* \* \*

*"Lot No. 10":* BEING KNOWN AND DESIGNATED as Lot No. 10 . . .

*"Promenade Parcels":* BEING KNOWN AND DESIGNATED as Parcels A, A–1, B, C and D . . .

*The "Boat Slip(s)":* Marina Slips Limited Common Elements known as Marina Slip Nos. B–14, C–4, C–10, D–5, D–9, E–5, E–6, E–7, E–8, E–9, E–10 and E–11 . . .

money aforesaid having been fully paid and satisfied to the Trustees, they are authorized to execute these presents.

NOW, THEREFORE, THIS DEED WITNESSETH, that the Trustees, for and in consideration of the premises and the consideration recited in the Deed from Grantors to Grantee referred to above, and for no other consideration, hereby grant and convey to the Grantee, its successors and assigns, all the Property hereinbefore described, with its appurtenances and all the rights, title, interest and estate of the Trustees, both at law and in the equity, in and to the same.

TO HAVE AND TO HOLD the same described Property unto Grantee, its successors and assigns, in fee simple, forever. [Emphasis supplied.]

On October 5, 1999, TLC purported to sell to West its expansion rights under the MCOA as well as the riparian rights:

## DEED OF RIPARIAN RIGHTS

The Developer [TLC] wishes to and does hereby grant and convey to West the remainder of the riparian rights not previously conveyed. From time to time, the Developer had the power to and did convey to the [Yacht] Club and others additional riparian rights necessary to construct, build, use and enjoy (i) additional piers and docks containing marina slips for use by members of the [Yacht] Club, or (ii) additional breakwater piers and/or debris barriers, and/or (iii) such other riparian structures or activities as the Developer has or may approve.

NOW THEREFORE, WITNESSETH that in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration (no actual consideration paid or to be paid), the receipt and sufficiency of which is hereby acknowledged, the Grantor does hereby grant and convey

unto West, its successors and assigns, those certain riparian rights further described on Exhibit A.[9]

SUBJECT to all matters of public record, including but not limited to a Marina Cross Operating Agreement between the Developer, the [Yacht] Club, and Tome's Landing Condominium, Inc., recorded among the Land Records of Cecil County. ...

TO HAVE AND TO HOLD the property above described unto the proper benefit and use of Grantee its successors and assigns.

## ASSIGNMENT OF DEVELOPER'S RIGHTS

### RECITALS

WHEREAS, the Assignor, Tome's Landing Corporation, is the "Developer" under that certain Declaration Establishing a Plan for Condominium Ownership for Tome's Landing, a Condominium, dated May 26, 1993 and recorded among the Land Records of Cecil County, Maryland at Book NDS 435, Page 18, as amended and supplemented from time to time (the "Declaration"), and under the Marina Cross Operating Agreement (the "[MCOA]") recorded as aforesaid; and

WHEREAS, Assignor desires to grant and assign to Assignee any and all rights, reservations, easements, interests, exemptions, privileges and powers which Assignor may have as the Developer under the Declaration and under the

---

9. Exhibit A states:

All those riparian rights and privileges belonging or appertaining to the real property shown on the subdivision plats of Tome's Landing, ... and known as Lots 1 through 10, Lot 6A, Parcel A–1 and Parcels A through D *including all of the riparian rights* in and to the waters of the Susquehanna River which is adjacent thereto.

Being those riparian rights conveyed by Deed dated May 20, 1993 from United Dominion Industries, Inc., a Delaware corporation unto Tome's Landing Corporation, a Maryland corporation (the Grantor herein). ...

*SAVING AND EXCEPTING:*

Those riparian rights transferred in a Deed dated May 26, 1993 from Tome's Landing Corporation to Tome's Landing Yacht Club, Inc. and recorded on May 27, 1993 ...

[MCOA]; and the Assignor has the right and power to do so pursuant to Section 19 of the Declaration and Paragraph 1 of the [MCOA]; and

WHEREAS, Assignee wishes to accept this Assignment.

### AGREEMENTS

NOW, THEREFORE, in consideration of the sum of Ten Dollars ($10.00) paid by each of the parties to the other, and other good consideration, the receipt and sufficiency of which are acknowledged, the parties agree as follows:

1. *Assignment of Developer's Rights.* Assignor hereby assigns to Assignee all of Assignor's rights, reservations, easements, interests, exemptions, privileges and powers to which Assignor may have as the Developer under the Declaration and the [MCOA] and particularly the Expansion Rights therein.

2. *Acceptance of Assignment by Assignee.* Assignee hereby accepts the assignment of rights of Developer by Assignor, in accordance with the terms of the Declaration and the [MCOA].

When West attempted to exercise its purported rights, Conrad/Dommel filed a declaratory judgment action in the Circuit Court for Cecil County on February 15, 2000, naming as defendants West, TLC, and Columbia Bank's Trustees, Charles C. Holman and Scott C. Nicholson. The complaint focused on West's claim to the riparian rights and sought a declaration that Conrad/Dommel was the owner of those rights.

Conrad/Dommel filed a motion for summary judgment on the day it filed its complaint. The trustees were subsequently dismissed from the suit, and, because it had not responded to the complaint, default judgment was entered against TLC.

On April 21, 2000, the court entered an order granting Conrad/Dommel's motion for summary judgment, without having heard oral argument. West successfully filed a motion to strike that ruling, and, on September 20, 2000, it filed its own motion for summary judgment, in which it raised the issue of the expansion rights for the first time. A hearing on the

motions for summary judgment took place on November 15, 2000, after which both Conrad/Dommel and West filed proposed findings and conclusions. On January 17, 2001, the court issued an oral ruling granting summary judgment in favor of Conrad/Dommel on the issue of the riparian rights. The court then set the matter for a further hearing on the issue of the expansion rights. West filed a motion for reconsideration of the ruling on riparian rights on February 1, 2001.

The Yacht Club filed a Motion for Joinder of Party [10] on February 23, 2001, which was granted on March 14, 2001. On April 23, 2001, Conrad/Dommel moved to join the Condominium as a necessary party, and the court granted the motion on May 9, 2001. A hearing was held on the issue of expansion rights on June 22, 2001, at which time the court issued an oral ruling granting summary judgment in favor of West. The Yacht Club, the Condominium, and Conrad/Dommel appealed that decision, and West cross-appealed the decision as to riparian rights. [11]

## DISCUSSION

### I. DECLARATORY JUDGMENTS

■ The circuit court did not enter a written declaration of the parties' rights in this case. This will necessitate a remand

---

**10.** Although it was titled as a motion for joinder, the motion was to intervene.

**11.** The grant of summary judgment handed down on January 17, 2001, with respect to the issue of the riparian rights was not meant to be a final judgment because the court continued the case for further hearing on the issue of the expansion rights. The docket entries clearly reflected the circuit court's intent that its oral ruling on June 22, 2001, be the final judgment, stating, in pertinent part:

Plaintiff's Motion for Summary Judgment: Motion Granted;
Defendant's Motion for Summary Judgment: Motion Denied[.]
Maryland Rule 2–601(a), however, requires each judgment to be entered on a separate document. For that reason, the case was remanded to the circuit court on September 30, 2002. After the circuit court entered final judgments on December 11 and 12, 2002, on the issues of riparian rights and expansion rights, the case was returned to this Court on December 19, 2002.

for entry of the appropriate written declaration of the rights of the parties. The Court of Appeals recently issued the following reminder:

Once again we are presented with an appeal in a declaratory judgment case in which the trial court failed to enter a written declaration of the rights of the parties. Nor did it file any written opinion which could be treated as a declaratory judgment. Instead, the docket entry and the separate document on which the judgment is set forth recite simply that summary judgment was entered in favor of Northern.

"This Court has reiterated time after time that, when a declaratory judgment action is brought, and the controversy is appropriate for resolution by declaratory judgment, 'the trial court must render a declaratory judgment.' *Christ v. [Maryland] Department [of Natural Resources]*, 335 Md. 427, 435, 644 A.2d 34, 38 (1994) ' "Where a party requests a declaratory judgment, it is error for a trial court to dispose of the case simply with oral rulings and a grant of . . . judgment in favor of the prevailing party.' *Ashton v. Brown,* 339 Md. 70, 87, 660 A.2d 447, 455 (1995), and cases there cited."

*Harford Mut. Ins. Co. v. Woodfin Equities Corp.,* 344 Md. 399, 414–15, 687 A.2d 652, 659 (1997).

*Bushey v. Northern Assur. Co. of Am.,* 362 Md. 626, 651, 766 A.2d 598 (2001).

To the extent that resolution of this case is based on the application of law to undisputed facts, we will exercise our discretion to address those issues prior to remand. *Bushey,* 362 Md. at 651, 766 A.2d 598. We will discuss this in more detail below, particularly as it applies to the expansion rights.

## II. STANDARD OF REVIEW

Summary judgment "is used to dispose of cases when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." *Okwa v. Harper,* 360 Md. 161, 178, 757 A.2d 118 (2000) (citations omitted). Although the granting of summary judgment in a

declaratory judgment action is " 'the exception rather than the rule,' " it is sometimes appropriate. *Utica Mut. Ins. Co. v. Miller*, 130 Md.App. 373, 380, 746 A.2d 935, *cert. denied*, 359 Md. 31, 753 A.2d 3 (2000) (citations omitted).

When reviewing a court's decision on summary judgment, we "must review the facts, and all inferences therefrom, in the light most favorable" to the nonmoving party. *Lovelace v. Anderson*, 366 Md. 690, 695, 785 A.2d 726 (2001). "Evidentiary matters, credibility issues, and material facts which are in dispute cannot properly be disposed of by summary judgment." *Underwood–Gary v. Mathews*, 366 Md. 660, 685, 785 A.2d 708 (2001) (citing *Pittman v. Atlantic Realty Co.*, 359 Md. 513, 536, 754 A.2d 1030 (2000)). Moreover, "[i]n appeals from grants of summary judgment, Maryland appellate courts, as a general rule, will consider only the grounds upon which the lower court relied in granting summary judgment." *PaineWebber Inc. v. East*, 363 Md. 408, 422, 768 A.2d 1029 (2001).

Because there is no dispute of material fact, "our review is limited to whether the trial court was legally correct." *Lippert v. Jung*, 366 Md. 221, 227, 783 A.2d 206 (2001). In other words, we look to whether the court correctly interpreted and applied the relevant law to the uncontested facts. *Fister v. Allstate Life Ins. Co.*, 366 Md. 201, 210, 783 A.2d 194 (2001). "As with all questions of law, we review this matter *de novo*." *Id.* The parties substantially agree on the underlying facts and that the outcome turns on an interpretation of the various documents including certain deeds.

### III. RULES OF CONSTRUCTION

"Ordinarily, the construction of a deed is a question of law for the court[.] ... In construing the language of a deed, the basic principles of contract interpretation apply." *Gregg Neck Yacht Club, Inc. v. County Comm'rs of Kent County*, 137 Md.App. 732, 759, 769 A.2d 982 (2001) (citations omitted). "These principles require consideration of ' "the character of the contract, its purpose, and the facts and circumstances of

the parties at the time of execution[.]" ' " *Chevy Chase Land Co. v. United States*, 355 Md. 110, 123, 733 A.2d 1055 (1999) (quoting *Calomiris v. Woods*, 353 Md. 425, 436, 727 A.2d 358, 363 (1999) (quoting *Pacific Indem. v. Interstate Fire & Cas.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985))).

"[T]he court is supposed to give effect to the intention of the parties, gleaned from the text of the entire instrument, unless that would violate a principle of law." *Gregg Neck*, 137 Md.App. at 759, 769 A.2d 982. Moreover, when "interpreting a deed whose language is clear and unambiguous on its face, the plain meaning of the words used shall govern without the assistance of extrinsic evidence." *Drolsum v. Horne*, 114 Md.App. 704, 709, 691 A.2d 742, *cert. denied*, 346 Md. 239, 695 A.2d 1227 (1997). "[W]e must consider the deed as a whole, viewing its language in light of the facts and circumstances of the transaction at issue as well as the governing law at the time of conveyance." *Chevy Chase*, 355 Md. at 123, 733 A.2d 1055.

"Thus the intention of a grantor is to be determined from the four corners of his deed, if possible, and if from an attempt to make such determination an irreconcilable conflict arises because of contradictions within the deed other means must be employed to ascertain the correct interpretation to be placed upon it. Words used in a deed should be construed in pari materia and a construction should be adopted which will give effect to all words. Each word and provision of the instrument should be given that significance which is consistent with, and will effectuate, the intention of the parties."

*Gregg Neck*, 137 Md.App. at 760, 769 A.2d 982 (quoting 4 Herbert T. Tiffany, THE LAW OF REAL PROPERTY § 981 at 112 (3d ed.1975, 1985 Cum.Supp.)) ("Tiffany").

Language is "ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning." *Calomiris*, 353 Md. at 436, 727 A.2d 358. The determination of ambiguity is also an issue of law subject to *de novo* review. *See Calomiris*, 353 Md. at 434, 727 A.2d 358.

"When the words in a deed ' "are susceptible of more than one construction," ' the deed is ' "construed against the grantor and in favor of the grantee...." ' " *Gregg Neck,* 137 Md.App. at 760, 769 A.2d 982 (quoting *Morrison v. Brashear,* 38 Md.App. 693, 698, 382 A.2d 353 (1978) (citation omitted)).

## IV. RIPARIAN RIGHTS

Although the issue of riparian rights is raised on cross-appeal, we address it first, because, to some extent, appellants' arguments regarding the expansion rights are dependent on the court's ruling that Conrad/Dommel obtained the riparian rights as a result of the foreclosure deed. West argues that the riparian rights had been severed by virtue of the May 20, 1993, deed from UDI to TLC and that they were never rejoined with the land from which they were severed. It also contends that, even if they had not been severed or were rejoined, TLC demonstrated an intention to reserve the riparian rights from the Columbia deed of trust. This, West maintains, rebuts the presumption that the riparian rights were included in that deed of trust.

Conrad/Dommel [12] argues that the trial court's decision was correct in that the language of the Columbia deed of trust was unambiguous. It also points out that well-established principles of law, namely the requirement that a grantor expressly reserve rights it does not wish to convey, are controlling in this case.

The circuit court made the following ruling with respect to the riparian rights:

> Starting in reverse order, the document [that is the] subject of this controversy, the primary document, is the foreclosure deed from the trustees of Columbia to [Con-

---

**12.** Neither the Yacht Club nor the Condominium was a party to the case at the time the ownership of the riparian rights was decided. Although these entities have adopted Conrad/Dommel's arguments on this issue, it is undisputed that the riparian rights owned by the Yacht Club and the Condominium are those limited rights granted in the deed dated May 26, 1993, the language of which is reproduced *supra.*

rad/Dommel] in this case dated September 11, 1998. And, of course, the primary concern, the primary conflict is what exactly did this deed transfer to [Conrad/Dommel]. Specifically, was the transferred document sufficient to transfer the riparian rights in question here. The transfer, of course, was in fee simple and the transfer clause and this deed included the word "water." Whereas, the previous deed of trust I believe the date was September 29th of 1994, the deed of trust from Tomes to Columbia, specifically as I recall included the word "water." By September the 29th of 1994 the transfer[or] or grantor, Tomes,[13] had acquired all of the parcels in question with the exception of Lot No. 10 which had been transferred from UDI to DMS. We go back to the transfer prior to that which is referred to in both memoranda as the first deed dated May 20th of 1993, the transfer being from UDI to Tomes, and that particular deed in the paragraph following the "Together with" paragraph specifically recites, "and, furthermore, together with all riparian rights and privileges belonging to or obtaining to the real property shown on the plat known as then Lots 1 through 10, including Lots 6, 8, Parcel A(1) and Parcels A, B, C and D," that particular deed is totally clear and unambiguous and there is absolutely no question in my mind that there was any type of reservation in the grantor at all reserving the riparian rights in question. Thereafter, when Tomes entered into the deed of trust in Columbia, Columbia in my opinion was the recipient of everything that Tomes had owned and, thus, was the recipient of the riparian rights. I do not find in any manner whatsoever that these riparian rights were ever severed, so the issue of severance and merger thereafter is really not an issue before me today. And the clear and unambiguous language of the deed of trust to Columbia, the language in that deed is clear and unambiguous as far as I'm concerned as well

---

13. This reference to Tome's appears to be to the Tome's entities generally, because, at the time the deeds of trust were signed, the lots were owned by three different Tome's entities: TLC, Tome's Main Street, Inc., and Tome's Commerce Center, Inc.

and did, in fact, include the riparian rights in question here today. And, again, there was no exclusion or reservation in Tomes or any third party.

Among other things as noted by [Conrad/Dommel] in the memoranda on page 12, paragraph three, and I adopt this as part of my opinion, the language of the Columbia Bank deed of trust encumbers the riparian rights because of, A, the Maryland code which provides, "A deed passes to the grantee the whole interest and estate of the grantor and the land mentioned in the deed unless in limitation or reservation shows by implication or otherwise a different intent." Intent, as I indicated previously, is not a matter of consideration here because, again, the language in the documents to which I'm referring to in my opinion is clear and unambiguous and I make that as a finding of fact as well as law.

## A. Riparian Rights in General

■ "Generally, a riparian landowner is 'defined as one who owns land bordering upon, bounded by, fronting upon, abutting or adjacent and contiguous to and in contact with a body of water, such as a river, bay, or running stream.' " *Kirby v. Hook,* 347 Md. 380, 389, 701 A.2d 397 (1997) (quoting *People's Counsel for Baltimore County v. Maryland Marine Mfg. Co.,* 316 Md. 491, 493 n. 1, 560 A.2d 32, 33 n. 1 (1989)). The riparian land in this case consists of Parcels A–1, A, B, C, and D, and part of Lot 10.

The term "riparian rights" indicates a bundle of rights that turn on the physical relationship of a body of water to the land abutting it. These rights are significantly different from each other in many respects, and yet they share a common name just as riparian landowners attempt to share the common benefits that arise from adjacency to defined bodies of water. This bundle includes at least the following rights:

(i) of access to the water;

(ii) to build a wharf or pier into the water;

(iii) to use the water without transforming it;

(iv) to consume the water;

(v) to accretions (alluvium); and

(vi) to own the subsoil of nonnavigable streams and other "private" waters.

1 WATERS AND WATER RIGHTS, § 6.01(a) at 6–3, 6–4 (Robert E. Beck, ed., 1991, 2001 Repl.Vol.) (footnote omitted) ("WATERS"). *See also Maryland Marine,* 316 Md. at 500–02, 560 A.2d 32. Maryland Code (1982, 1996 Repl.Vol., 2000 Repl.Vol.), § 16–201(a) of the Environment Article ("EA") states:

A person who is the owner of land bounding on navigable water is entitled to any natural accretion to the person's land, to reclaim fast land lost by erosion or avulsion during the person's ownership of the land to the extent of provable existing boundaries. The person may make improvements into the water in front of the land to preserve that person's access to the navigable water or protect the shore of that person against erosion.

A "riparian owner may not be deprived of any right, privilege or enjoyment of riparian ownership that the riparian owner had." E.A. § 16–103(a).

## B. Severability

West argues that riparian rights were severed from the fast land by virtue of the May 20, 1993 deed, which specifically conveyed the riparian rights of Lots 1–10 and Parcels A D, although it did not convey the fast land. Conrad/Dommel maintains that no severance occurred,[14] but that, in the event it had, the rights were reunified with the fast land at the time the Columbia deed of trust was executed.

---

14. We agree with Conrad/Dommel that the grant of the riparian rights to Lots 1, 2, 3, 4, 5, 6, 6A, 7, 8, and 9 was without effect, because they are not riparian lands. Riparian land "relat[es] to, or [is] located on the bank of a river or stream[.]" BLACK'S LAW DICTIONARY 1328 (9th ed.1999). Lots 1–9 do not touch the water, because Parcels A, A1, B, C, and D are located between those lots and the river. Consequently, the parcels and Lot 10 are the riparian land.

■ "Although a conveyance of land bordering on navigable water presumptively carries with it the grantor's riparian rights, ... this presumption may be rebutted." *Williams v. Skyline Development Corp.*, 265 Md. 130, 162, 288 A.2d 333 (1972). "Courts presume a deed to riparian land carries riparian rights with the land unless the rights had been severed from the land before the conveyance or there is language in the deed to reserve those rights." WATERS, § 7.04(a)(1) at 7–92 (footnote omitted).

> In most of the states in which the question has arisen, the owner of land bordering on the water has been regarded as entitled to sever the right of reclamation and wharfing out from the land to which it originally appertained, so as to vest it in a person having no interest in such land. This he may do either by a transfer of the land retaining the right, or by a transfer of the right retaining the land.

*Tiffany*, at § 667 at 723. *See also* Md.Code (1974, 1996 Repl.Vol., 2000 Supp.), § 2–101 of the Real Property Article ("RP").[15]

■ Conrad/Dommel argues that, because UDI did not expressly reserve the fast land in the May 20, 1993 conveyance, its grant of the riparian rights was without effect. Although we agree that, for clarity, the better practice would be to expressly reserve the fast land, we believe the riparian rights were conveyed, because the intent to convey those rights is clear from the language of the deed. *See Tiffany at § 667.*[16]

---

15. That provision states:

The word "grant", the phrase "bargain and sell," in a deed, or any other words purporting to transfer the whole estate of the grantor, passes to the grantee the whole interest and estate of the grantor in the land mentioned in the deed unless a limitation or reservation shows, by implication or otherwise, a different intent.

16. We point out that the both Parcel A and its riparian rights were transferred by the May 20, 1993 deed. Because both the land and its riparian rights were transferred at the same time, the riparian rights to Parcel A were not severed by the conveyance.

## C. Merger

Conrad/Dommel argues that, to the extent any riparian rights were severed by the May 20, 1993 deed, those rights were reunified with the land at the time the Columbia deed of trust was executed. West argues that there was no reunification because intermediate estates had been created, making reunification impossible.

West frames its argument in terms of a merger of two estates. " 'Under the doctrine of merger of estates in land, a lesser estate is merged into a greater estate whenever both estates meet in the same person.' " *Friends of the Ridge v. Baltimore Gas & Elec. Co.*, 352 Md. 645, 657, 724 A.2d 34 (1999) (quoting *Appeal of Gregor*, 156 Pa.Cmwlth. 418, 627 A.2d 308, 310 (1993)). Conrad/Dommel argues that riparian rights do not constitute a "separate," or "lesser" estate, like, for example, easements, and therefore that the doctrine of merger is inapplicable.

"Merger is the absorption of one estate in another, and takes place usually when a greater estate and a less coincide and meet in one and the same person without any intermediate estate, whereby the less is immediately merged or absorbed in the greater. To constitute a merger, it is necessary that the two estates be in one and the same person, at one and the same time, and in one and the same right." 10 R.C.L. 666. In 1 *Tiffany's Real Property* (1st Ed.), 76, the learned author states: "It is a well-settled rule of law that whenever a greater estate and a less coincide and meet in one and the same person, without any intermediate estate, the less is immediately annihilated, or, in the law phrase, it is said to be 'merged,' that is, sunk or drowned in the greater." (Citing 2 *Blackstone's Comm.* 177, and 4 *Kent's Comm.* 99.)

*Bosley v. Burk*, 154 Md. 27, 30, 139 A. 543 (1927).

In regard to riparian rights, "[o]nce the [riparian] rights are severed, no subsequent owner of the tract will have riparian rights except if the owner independently acquires riparian rights to unite with the now limited fee in the

formerly riparian land." WATERS, § 7.04(a)(2) at 7–95, 7–96 (and cases cited therein). *See also Riviera Asso. v. North Hempstead,* 52 Misc.2d 575, 577, 276 N.Y.S.2d 249, 252 (N.Y.Sup.Ct.1967) (suggesting that merger of severed riparian rights with its fast land is possible even though it did not occur in that case); and *Commonwealth, Marine Resources Comm'n v. Forbes,* 214 Va. 109, 197 S.E.2d 195, 199 (1973) (stating that severed riparian rights had merged with fast land when a single party acquired both).

West argues in its brief that the deed from TLC granting limited riparian rights to the Yacht Club "qualifies as an **intermediate estate** for purposes of considering whether a merger has taken place." (Emphasis by West.) This argument is necessarily limited to the riparian rights associated with Parcel A, because the limited riparian rights assigned in the deed emanated from Parcel A, as shown in Exhibit A to the deed:

Keeping the foregoing in mind, West argues that, because some of the riparian rights were assigned to the Yacht Club, an intermediate estate was created. Consequently, West argues, the riparian rights to Parcel A and the fast land of Parcel A could not be merged by virtue of the Columbia deed of trust. As stated above, however, riparian rights can be broken down into a number of different property rights. WATERS at § 6.02 at 6–3, 6–4. Accordingly, a grantor may assign some of these riparian rights and retain the rest. The assignment of some of these rights, as occurred here, would not necessarily defeat a subsequent merger. We explain.

In reviewing the language of the deed of limited riparian rights, which allows for the construction, placement, and maintenance of "certain breakwater piers, debris barrier piers and/or other marginal walkway piers and gangplanks[,]" we are persuaded that the entire bundle of riparian rights associated with Parcel A was not deeded from TLC to the Yacht Club, and therefore, they were not severed from the fast land in the same manner that the riparian rights were severed from the fast land by virtue of the May 20, 1993 deed from UDI to TLC.

Rather, the deed of limited riparian rights appears to be more in the nature of an easement, and we note that Section 2 of the MCOA, which is set forth in the Factual and Procedural Background, *supra,* actually does grant cross-easements to TLC, the Yacht Club, and the Condominium for the same purposes that TLC granted the limited riparian rights to the Yacht Club and Condominium. West itself recognizes in its brief that the rights granted by the deed were "reciprocal." The assignment of limited riparian rights and the cross-easements might cloud TLC's title, but they do not create an "intermediate estate" in those retained riparian rights that would prevent Columbia Bank or Conrad/Dommel from owning Parcel A and its associated riparian rights. Moreover, West has no assignment of whatever riparian rights that the Yacht Club acquired from TLC.

West focuses on the Columbia and UDI deeds of trust to ascertain the status of the riparian rights, but we do not believe those deeds alone answer the question. We begin, instead, with the deeds transferring Parcels A–1, B, C, and D, and Lot 10, starting with the Parcels.

Parcels A–1, B, C, and D were conveyed from UDI to TLC on September 29, 1994. Because at the time of that conveyance TLC already owned the riparian rights attendant to the newly acquired fast land, the riparian land was reunified with the riparian rights in TLC. In *Forbes,* 197 S.E.2d at 199, the Virginia Supreme Court stated:

As we have said, riparian rights related to the lots named in the deed were severed riparian rights, and so long as they remain severed, they confer no right under the statute to fill. However, when a property interest severed by an antecedent owner from the fee is acquired by a subsequent owner of the limited fee, the two property interests merge to revive the fee simple absolute. As we said in *Newsome v. Scott,* 200 Va. 833, 840, 108 S.E.2d 369, 374 (1959), quoting from *Garland v. Pamplin, et als.,* 73 Va. 305, 315 (1879):

" 'Merger is described as the annihilation of one estate in another. It takes place usually when a greater estate and a less coincide and meet in one and the same person, without any intermediate estate, whereby the less is immediately merged—that is, sunk or drowned in the greater. To this result, it is necessary that the two estates should be in one and the same person, at one and the same time, in one and the same right. 2 Bouv. Institutes, 375, No.1989; 2 Minor's Inst. (2d ed.), 368 *et seq.*' "

By the deed of July 18, 1967 defendants acquired both the limited fee to Lots 45, 46, 52 and 53 in Block H, Lot 1 in Block V, and all eight lots in Block Y and the severed riparian rights related to those lots. Applying the doctrine of merger, the two property interests merged, the fee simple absolute was revived[.]

*See also Warfield v. Christiansen,* 201 Md. 253, 258, 93 A.2d 560 (1953) ("[T]o constitute a merger, the two estates must unite in the same person in the same right.").

The riparian rights associated with Parcels A–1, B, C, and D, were severed by the May 20, 1993 deed and conveyed from UDI to TLC. These rights were reunited with the riparian land on September 29, 1994, when UDI conveyed Parcels A–1, B, C, and D to TLC in fee simple.[17]

Likewise, the riparian rights to Lot 10 were conveyed from UDI to TLC on May 20, 1993. Lot 10 was conveyed by UDI

---

17. This transaction was subject to the MCOA.

to Tome's Main Street, Inc. on September 29, 1994. The riparian rights to Lot 10, however, were owned by TLC at that point. There was no reunification as a result of that deed.

### D. Columbia Deed of Trust

We now turn to the effect of the Columbia deed of trust. West argues that a deed of trust is not like a deed, and that the trustees gain only a security interest but no rights in the land. We believe that this argument reflects a misunderstanding of what occurs when a deed of trust is executed in Maryland.

> Mortgages and deeds of trust differ as to form, parties and the rights and duties created. There are two parties to a mortgage; the mortgagor (debtor) and the mortgagee (creditor). Deeds of trust are three party instruments; the grantor (debtor), the grantee (trustee) and the cestui que trust or beneficiary (creditor). When a mortgage is used, the property is conveyed directly to the creditor. With a deed of trust, the **property is conveyed** to a third party in trust for the benefit of the creditor.

Russell R. Reno, Jr., Wilbur E. (Pete) Simmons, Jr., and Kevin L. Shepherd, MARYLAND REAL ESTATE FORMS, § 3.1 at 275 (1983) (hereinafter "Reno") (emphasis supplied).

West is correct that deeds of trust that evidence a security interest are treated as mortgages. *Darnestown Valley–WHM Ltd. P'shp. v. McDonald's Corp.*, 102 Md.App. 577, 584, 650 A.2d 1365 (1994), *cert. denied*, 338 Md. 201, 657 A.2d 795 (1995). Under either a mortgage or a deed of trust, however, the mortgagee or trustee actually receives legal title to the property. *Darnestown*, 102 Md.App. at 586, 650 A.2d 1365 (quoting *Williams v. Safe Deposit & Trust Co.*, 167 Md. 499, 503–04, 175 A. 331 (1934)).

Maryland is a "title" state. **This means that a mortgage or deed of trust ... will transfer legal title to the mortgagee or grantee,** rather than creating a lien on the title of the mortgagor or the grantor, as is the case in a

> "lien" state. The interest of the mortgagor is called the equity of redemption; *i.e.,* the equitable right of the debtor, on payment of the debt, to compel a reconveyance of the mortgaged property.

Reno, § 3.1 at 276 (emphasis supplied).

The fact that a merger had occurred and TLC owned both the riparian rights and riparian land, *i.e.,* Parcels A1 and A D, and Tome's Main Street owned Lot 10,[18] does not mean that TLC and Tome's Main Street actually transferred those rights in the Columbia deed of trust. Indeed, West argues that the intent of the parties not to transfer the riparian rights was clearly evidenced by the language of the Columbia deed of trust when read together with the UDI deed of trust. Conrad/Dommel contends that, because riparian rights are assumed to pass with the land and no express reservation was contained in the deed, they became part of the trust property to which Columbia Bank obtained legal title, and that Columbia Bank could convey the riparian rights to Conrad/Dommel after foreclosure.

As we stated above, "a conveyance of land bordering on navigable water presumptively carries with it the grantor's riparian rights." *Williams,* 265 Md. at 162, 288 A.2d 333. *See also* WATERS, § 7.04(a)(1) (footnote omitted). In *Williams,* the Court of Appeals found that the presumption was rebutted because of express reservations contained in the deed. *Id.*

One commentator has written that, with respect to the creation of reservations,

> at least two general rules can be identified: (1) the language of a deed must be sufficiently definite and clear in order to create a reservation or exception. (2) In accord with the general rule that deeds are to be construed against the grantor, exceptions and reservations are to be narrowly construed.

---

18. If the riparian rights were intended to be conveyed, Lot 10's riparian rights would be reunited as a result of the Columbia deed of trust as conveyed to Conrad/Dommel by the trustees.

9 THOMPSON ON REAL PROPERTY, SECOND THOMAS EDITION, at § 82.09(c)(2) 597–98 (Davis A. Thomas ed., 1999) (footnotes omitted).

Conceding that there was no express reservation in the Columbia Deed of Trust, West argues that TLC's intent to reserve riparian rights was clear, because neither riparian rights nor "waters" were expressly mentioned and conveyed in the Columbia Deed of Trust as they were in the UDI Deed of Trust. West appears to argue that the two deeds of trust should be read together in order to give effect to the intent of the parties, but it must be remembered that Columbia Bank was not a party to the UDI Deed of Trust and that the deed first in time governs. *See Laborde v. Mayeux,* 95 So.2d 743, 745 (La.Ct.App.1957); *Will v. Piper,* 184 Pa.Super. 313, 134 A.2d 41, 44 (1957); *Groeneveld v. Camano Blue Point Oyster Co.,* 196 Wash. 54, 81 P.2d 826, 829 (1938); 1 Black. Com., chap. 23, § 6 p. 381. Moreover, a "distinction has been maintained in the law between implied grants and implied reservations." *Dalton v. Real Estate & Improvement Co.,* 201 Md. 34, 47, 92 A.2d 585 (1952). Whereas a grant may be implied, a reservation generally will not be implied. *See id.*

Here, the riparian rights to Parcels A1 and A–D granted to TLC were reunified with the riparian lands from which they came prior to the execution of the Columbia deed of trust. Because Tome's Main Street, owner of Lot 10, and TLC, owner of the riparian rights to Lot 10, were both parties to the Columbia deed of trust, the riparian rights were reunited with Lot 10 and conveyed to Conrad/Dommel pursuant to the foreclosure deed. Absent an express reservation, it is presumed as a matter of law that the riparian rights were conveyed in the deeds of trust. Nothing in the Columbia deed of trust rebuts that presumption and persuades us that TLC reserved or intended to reserve the riparian rights.[19]

19. As a practical matter, and contrary to West's position, it is inconceivable to us that the lead commercial lender of a mixed use waterfront development would not expect the applicable riparian rights associated with the property securing the loan to be part of its security.

Because TLC could only lawfully convey to West what it possessed, *Worthington v. Lee,* 61 Md. 530, 539 (1884), West acquired no riparian rights from TLC. Subject to an entry of a declaration of the rights of the parties, as explained *supra,* we affirm the trial court's decision with respect to this issue.

## V. EXPANSION RIGHTS

The expansion rights at issue are those set forth in the MCOA, reproduced *supra.* During the proceedings below, West spoke of "developer rights," but it is undisputed that the developer rights as defined in the condominium plan [20] were assigned to Columbia Bank on July 8, 1998, apparently as a prelude to the foreclosure action. The rights at issue are those contained in the MCOA and will be referred to as "expansion rights."

A request for a declaratory judgment on the ownership and performance of the expansion rights was not specifically requested in Conrad/Dommel's complaint. In its complaint, Conrad/Dommel requested, in pertinent part:

---

20. Those rights are as follows:

A. The Developer hereby reserves, for a period of seven (7) years after the date hereof, the right (which shall be exercisable at its sole discretion) to expand the Condominium by subjecting to the Condominium Regime, and thereby adding to the Condominium, any one or more of those parcels of land in Cecil County which are designated on the Condominium Plat as Future Parcel 1, Future Parcel 2, Future Parcel 3, Future Parcel 4, Future Parcel 5, Future Parcel 6, Future Parcel 7, Future Parcel 8, Future Parcel 9 respectively, and are more particularly described in Exhibit E [which is not in the record provided to this Court], together with all of the respective improvements thereon and all of the respective rights, alleys, ways, waters, privileges, appurtenances and advantages, to the same belonging or in any way appertaining (each of which parcels, together with such improvements thereon and appurtenances thereto, is hereinafter sometimes referred to as a "Future Parcel").

In addition, the Developer reserves the right to expand the Condominium by adding to the Condominium from time to time as Limited Common Elements riparian rights, docks, slips and other improvements or rights appurtenant to or constituting the Marina or any portion thereof. Any such expansion shall occur in the portion of the Susquehanna River shown on the Condominium Plat.

A. That this Honorable Court determine and adjudicate the rights and liabilities of the parties with respect to the West Deed and the Riparian Rights associated with the Trust Land; and

B. That this Honorable Court find and declare that Conrad/Dommel is the fee simple owner of all of the Riparian Rights associated with the Trust Land; and

C. That this Honorable Court find and declare that the West Deed does not confer upon the Defendants any interest in any of the Riparian Rights associated with the Trust Land[.]

Conrad/Dommel, of course, sought a declaration that West had no rights of any kind. The fact that a party may not be entitled to the declaration requested does not mean that the rights, whatever they may be determined to be, are not to be declared. *See Bushey,* 362 Md. at 651, 766 A.2d 598. Moreover, in its answer, West made a general request for a declaration of its rights arising out of the October 5, 1999 deed and assignment from TLC. West requested that the court "issue a declaration in favor of Defendant, including the retention of those rights, title and interest conveyed to it pursuant to the deed dated October 5, 1999." The motions and memoranda filed in conjunction with the summary judgment requests showed that Conrad/Dommel made specific allegations and requested a specific declaration, in the event the court found the transfer of the expansion rights to have occurred, concerning West's ability to exercise its rights. Conrad/Dommel requested the following action, in pertinent part, beginning with paragraph C of the Conclusion section of its Supplemental Memorandum in Support of Motion for Summary Judgment:

C. That this Honorable Court find and declare that Conrad/Dommel is the owner of all of the Expansion Rights associated with the Trust Land; and

D. That this Honorable Court find and declare that the [MCOA] does not confer upon the Defendant any Expansion Rights associated with the Trust Land; and

E. That, in the alternative, this Honorable court find and declare that the only Expansion Rights to which the Defendant is entitled are those adjacent to Parcels A–1 and A.

\* \* \*

G. That this Honorable Court order any and such further legal and equitable relief as the nature of the Plaintiff's cause may require or allow.

Although the trial court did not believe the issue was before it, it seems clear that there was the need for a declaration of the operational effect of any rights West was deemed to have acquired.

 Appellants argue that the expansion rights were assigned to Columbia Bank as part of the Assignment of Developer Rights, but that, even if they had been conveyed to West, the description of the rights was so uncertain as to render the instrument void. Appellants also make a number of alternative arguments in their brief, which we will discuss later. The trial court stated:

THE COURT: Now it could very well be, as posed by [Conrad/Dommel], that by virtue of not having any riparian rights, if indeed West has the development rights, they're pretty much worthless because nothing can be done or exercised; I am seeing from [Conrad/Dommel's] perspective. Apparently and practically that must not be the case because they're fighting hard to retain what has been conveyed to them. That's not a consideration for me anyhow.

As far as the cross-operating agreement itself, and the fact that it could be construed as being vague, uncertain in its terms, this was an agreement, multi-party agreement, and apparently when it was drawn up, I presume by predecessors in interest, it was clear enough for them; whereby, they all became signatories to these agreements; and of course the present parties stand in the shoes of the predecessors. So I don't know that it's a valid complaint from

them—from [Conrad/Dommel] at the present time to vitiate this agreement because of vagueness and uncertainty.

Of course, as far as the purpose of the agreement, and the intent, the integration, et cetera, et cetera, that's not before me today either. The only thing I have to decide is whether or not there was, in fact, a valid conveyance of the developer rights, which now are with West, according to the argument, with [West].

Now unlike the other aspects of this case, this particular aspect troubles me the least. No question that the marina cross-operating agreement was executed on May 26, 1993. Beyond any question in my mind pursuant to that agreement [T]LC was the developer. Now the developer rights as to the condominium were transferred by an assignment of developer's rights dated July 8, 1998, and then again on September 11, 1998 by the same sort of document unto [Conrad/Dommel].

And of course by virtue of receiving these documents of transfer [Conrad/Dommel] acknowledged that they are— that is the proper method of making that type of a transfer of that type of a right; and further an admission and recognition that such right did not pass by virtue of foreclosure deed, they recognized this to be a proper vehicle in which to transfer the same type of document—well, maybe not the same type of document.

In any event, pursuant to the exact wording of the marina cross-operating document it's clear from that document that the developer rights as to the marina were transferred to West Development; and therefore, [West's] motion for summary judgment as to development rights is granted. [Conrad/Dommel's] motion in that regard, of course, is denied.

## A. Assignment to Columbia Bank

Appellants argue on appeal, apparently for the first time, that Columbia Bank acquired all of the expansion rights by virtue of either the separate assignment of developer's rights or the Columbia deed of trust. West argues that, because

appellants failed to raise these arguments below, they have waived their right to raise them. Because the issue is basically one of document interpretation, which in the first instance is generally a question of law and, thus, subject to *de novo* review on appeal, we will address the issue. *Lerner Corp. v. Three Winthrop Props., Inc.,* 124 Md.App. 679, 684, 723 A.2d 560 (1999). Our interpretation begins with the plain meaning of the contractual language. If the language is clear, we need look no further. *County Comm'rs v. St. Charles Assocs.,* 366 Md. 426, 444, 784 A.2d 545 (2001).

### 1. The Assignment of Developer's Rights

The language of the July 8, 1998, Assignment of Developer's Rights to Columbia Bank stated, in pertinent part:

WHEREAS, Assignor is the "Developer" under that certain Declaration Establishing a Plan for Condominium Ownership for Tome's Landing, a condominium, and recorded among the Land Records of Cecil County . . ., and

WHEREAS, Assignor desires to grant and assign to Assignee any and all rights, reservations, easements, interests, exemptions, privileges and powers which Assignor may have as the Developer under the Declaration, and the Assignor has the right and power to do so pursuant to Article XI, Section 19 of the Declaration[.]

The language of this instrument is clear, and it purports only to convey the developer's rights under the condominium plan. No mention is made of the MCOA and its expansion rights. The expansion rights were not transferred to Columbia Bank by virtue of this instrument.

### 2. The Columbia Deed of Trust

The pertinent language of this document is:

TOGETHER with all leases, rents, profits, and benefits to the extent they may constitute accounts, including any deposits of tenants to secure payment of the same and performance of the terms and conditions of any oral or written lease, with respect to the leasing of all or any portion of the Land or improvements thereon; and all of the

accounts of Grantor, **including without limitation,** all notes, accounts receivable, drafts, acceptances and similar instruments and documents, **and all contract rights;** and

TOGETHER with all plans and specifications, surveys and surveyor's reports, engineer's and architect's reports, diagrams and drawings; sewer and water taps, allocations and agreements for utilities, bonds, utility deposits, refunds of fees or deposits paid to governmental authorities; licenses, permits, approvals and applications therefor from governmental authorities; **contracts,** subcontracts, service contracts, books, records, reports, accounting records, invoices, change orders, correspondence, diagrams, drawings, schematics, sales and promotional materials, **wherever located and whenever created, compiled or made with respect to the Land or the improvements thereon**[.] [Emphasis supplied.]

This language at least suggests that contract rights, such as those contained in the MCOA, were transferred to the trustees and subsequently to Conrad/Dommel by virtue of the foreclosure deed. In the first paragraph reproduced above, "contract rights" may refer to contract rights in the context of accounts, or separate contract rights. In the second paragraph reproduced above, although "contracts" appears to refer to contracts with third parties for work done at the property, the language "contracts ... wherever located and whenever created" could be construed as covering the contract rights contained in the MCOA. Moreover, it is realistic to understand that the intent of the security transaction was to put Columbia and its ultimate successors and assigns in the place of the developer of this mixed-use waterfront project. To do so, the expansion rights provided by the MCOA would be important. At the very least, we believe there is an ambiguity created that cannot be resolved on summary judgment.

It appears that the trial court's grant of summary judgment on this issue was based primarily on its interpretation of the MCOA and to the assignment of developer rights under the condominium plan. Because of the ambiguity in the Columbia deed of trust, and because we believe the trial court erred in

finding the MCOA unambiguous, as explained below, it can determine on remand if the expansion rights passed to Conrad/Dommel by virtue of the Columbia deed of trust.

## B. Ambiguities in the MCOA

The trial court found the MCOA to be unambiguous. Although the plain language of the MCOA may appear clear, the actual operation of the agreement in the context of the applicable facts is not.

For example, appellants argue that the MCOA is vague with respect to the scope of the easements, as described in the following description of the location of the area for expansion:

The Developer and the other parties wish to provide for the efficient, integrated operation of all Slips, Piers and Docks in the Marinas, the Developer Marina and in the **waters adjacent thereto,** and to ensure the Developer the maximum rights to enjoy and develop such Slips, Piers and Docks (such rights as provided in this Agreement are herein collectively referred to as the "Expansion Rights"). [Emphasis supplied.]

Appellants argue that the word "adjacent" is not specific enough to identify the area for expansion. West, on the other hand, argues that the location of development was fixed pursuant to Exhibit A of the MCOA, which is depicted *supra.*

"It is a well-established rule of construction that a contract should be interpreted in its entirety such that a court does not dismiss or disregard any clause or phrase as meaningless." *Kendall v. Nationwide Ins. Co.,* 348 Md. 157, 169, 702 A.2d 767 (1997). Exhibit A contains a note stating: "The layout of slips is shown for purposes of illustration only. In accordance with the [MCOA], the Developer may build less than all of the slips shown hereon, may build a Developer Marina in lieu of any slips shown hereon, and may otherwise exercise rights granted in the [MCOA]." Even though Exhibit A does not precisely place piers, gangplanks, and slips to be built in the future, we believe it clear that "adjacent" in the

context of the MCOA was intended to mean in the waters adjacent to the existing structures.

Although this particular portion of the MCOA, which the trial court addressed, is not ambiguous, we believe that, overall, it is. The MCOA was one piece of a larger development scheme. Therefore, it was drafted and executed on the premise that the developer of the marinas would also be the developer of the condominiums and the rest of the property. Ambiguity arises when the expansion rights under the MCOA are separated from the actual development of the project. This ambiguity includes limitations on the scope and time in which to exercise the expansion rights. The developer reserved the right to expand the condominium, but that right lasted only seven years. The MCOA does not contain a time limit for the exercise of the expansion rights, which appellants indicate raises the issue of the rule against perpetuities. In addition, Conrad/Dommel owns the riparian rights and does not appear to be inclined to cooperate and assign the necessary limited rights that West might need to expand the piers.

These ambiguities call into question whether, assuming West acquired the expansion rights, it can effectively exercise those rights. Although we need not decide, it may be that these matters cannot be resolved on summary judgment.[21] Moreover, because this issue remains open, there is an ongoing controversy, and the probability of further litigation seems almost certain. Accordingly, we remand this case for further proceedings, and the entry of a written declaration of the rights of the parties.

21. We note that the MCOA contained the following arbitration provision:

(d) *Enforcement by Developer.* In the event either the [Yacht] Club or the Condominium shall breach or obstruct any of the Expansion Rights or other right or benefit of Developer [TLC] under this Agreement, the Developer shall be entitled (i) to refer such matter to binding arbitration in the manner provided by, and in accordance with Section 5 above, and/or (ii) pursue any other remedy available to Developer at law or in equity.

**JUDGMENT AFFIRMED IN PART AND VACATED IN PART; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY WEST.**

APPENDIX
CHART OF LAND TRANSFERS

| Date | Parties | Title of Document | Subject of Conveyance |
|---|---|---|---|
| 05/20/93 | UDI to TLC | Declaration of Easements, Covenants, and Restrictions | various easements and notice of intent to convey the property to TLC |
| 5/20/93 | UDI to TLC | Deed | Lots 3 and 4, Parcel A in Fee Simple; the riparian rights to Lots 1-10, Parcels A-1, A, B, C, and D |
| 05/26/93 | TLC to the Yacht Club | Deed of Riparian Rights and Agreement | "certain limited riparian rights to construct, place and maintain certain breakwater piers, debris barrier piers and/or other marginal walkway piers and gangplanks." |
| 05/26/93 | TLC, the Yacht Club, the Condominium | Marina Cross Operating Agreement | various easements; provides for the operation of the Condominium and Club Marinas; expansion rights, including possibility of future construction of Developer Marina |
| 05/26/93 | TLC | Declaration Establishing a Plan for Condominium Ownership for Tome's Landing, a Condominium | initially concerns Lot 3 and establishes a condominium regime for the property |
| 07/22/93 | TLC | First Amendment to the Declaration of Tome's Landing, a Condominium | extending the condominium to include Lot 4 |
| 09/27/93 | UDI to TLC | Deed | Lot 5 in fee simple |
| 09/28/93 | TLC | Second Amendment to the Declaration of Tome's Landing, a Condominium | extending the condominium to include Lot 5 |
| 06/15/94 | UDI to TLC | Deed | Lot 2 in fee simple |

| Date | Party | Document | Description |
|---|---|---|---|
| 6/27/94 | TLC | Third Amendment to the Declaration of Tome's Landing, a Condominium | extending the condominium to include Lot 2 |
| 09/29/94 | UDI to TLC | Deed | Lot 6A in fee simple |
| 09/29/94 | UDI to Tome's Main Street, Inc. | Deed | Lot 10 in fee simple |
| 09/29/94 | UDI to TLC | Deed | Lots 1, 7, 8, and 9, and Parcels A-1, B, C, and D in fee simple |
| 09/29/94 | UDI to Tome's Commerce Center, Inc | Deed | Lot 6 in fee simple |
| 09/29/94 | TLC, Tome's Main Street, Inc., Tome's Commerce Center, Inc.; Columba Bank; Trustees Holman and Nicholson | Deed of Trust and Security Agreement | deed of trust to finance $1.5 million debt covering specific condominium units on Lots 2, 3, and 4, specific marina slips, Lots 1, 6, 7, 8, 9, and 10, and Parcels A, A-1, B, C, and D |
| 09/29/94 | TLC, Tome's Main Street, Inc., Tome's Commerce Center, Inc.; UDI; Trustees Burris and Drury | Part Purchase Money Deed of Trust and Security Agreement | deed of trust to finance $9,086,133.00 covering Lots 1, 6, 6A, 7, 8, 9, and 10, Parcels A-1, A, B, C, and D, certain condominium units "together with all riparian rights and privileges belonging or appertaining to the real property shown on the Plat, including all riparian rights and privileges in and to the waters of the Susquehanna River." |
| 06/30/95 | TLC | Fourth Amendment to the Declaration of Tome's Landing, a Condominium | specified marina slips |
| 08/29/95 | TLC | Fifth Amendment to the Declaration of Tome's Landing, a Condominium | specified marina slips |

| 01/23/96 | TLC, Tome's Main Street, Inc., Tome's Commerce Center, Inc.; Columbia Bank; Trustees Holman and Nicholson | Loan Documents Modification Agreement | increasing loan amount to $3 million |
|---|---|---|---|
| 07/08/98 | TLC to Columbia Bank | Assignment of Developer's Rights | assigning developer's rights existing under the condominium plan |
| 09/11/98 | Trustees Holman and Nicholson to Conrad/Dommel | Deed | deeding property that was the subject of the Columbia deed of trust and which was the subject of foreclosure sale |
| 10/05/99 | TLC to West | Deed of Riparian Rights, Assignment of Developer Rights, and Agreement | riparian rights and expansion rights under the MCOA |